# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| Daniel Ferrari and Charlene Ferrari,<br><br>    *Petitioners*,<br><br>v.<br><br>William Francis,<br><br>    *Respondent*. | Case No. 1:25-cv-3127<br><br>Judge Linsay C. Jenkins<br><br>Magistrate Judge Heather K. McShain<br><br>Underlying Litigation:<br>*Ferrari v. Francis*, Case No. 3:23-cv-0445-S, in the United States District Court for the Northern District of Texas |

## RESPONDENT WILLIAM FRANCIS'S RESPONSE TO PETITIONERS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH SUBPOENAS AND FOR PROTECTIVE ORDER

Respectfully submitted,

Kevin B. Duff
 IL Bar No. 6210491
 kduff@rdaplaw.net
RACHLIS DUFF & PEEL, LLC
542 S. Dearborn Street, Suite 900
Chicago, IL 60605
Tel. 312.733.3390

Cortney C. Thomas
 Texas Bar No. 24075153
 cort@brownfoxlaw.com
Charlene C. Koonce
 Texas Bar No. 11672850
 charlene@brownfoxlaw.com
Andrew C. Debter
 Texas Bar No. 24133954
 andrew@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, TX 75225
Tel. 214.327.5000

*Attorneys for Respondent William Francis*

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................. 1

II. FACTUAL BACKGROUND .............................................................................................. 2

III. LEGAL STANDARD ......................................................................................................... 7

IV. ARGUMENT ...................................................................................................................... 8

 A. Petitioners Possess Unique and Highly Relevant Information. ............................. 8

 B. Testimony from Phoenix Executives Is Patently Insufficient as a Substitute ................................................................................................................ 9

 C. Petitioners' health concerns do not justify quashing the depositions because they fail to show that the depositions cannot safely take place with accommodations. .................................................................................................. 11

 D. Respondent Has Pursued Alternative Discovery Without Success. ..................... 13

 E. Petitioners' Burden Argument Is Insufficient to Justify Quashing the Depositions. ........................................................................................................... 15

V. CONCLUSION ................................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Cases**

*Armstrong v. MGC Mortg., Inc.*,
 No. 1:09-CV-00131, 2010 WL 3835703 (N.D.W. Va. Sept. 28, 2010) ...................................... 7

*Arnold v. Wausau Underwriters Ins. Co.*,
 No. 13-60299-CIV, 2013 WL 5488520 (S.D. Fla. Sept. 30, 2013) ............................................ 8

*Campos v. Webb Cnty. Tex.*,
 288 F.R.D. 134 (S.D. Tex. 2012) .................................................................................... 7, 8, 12

*Global Material Techs., Inc. v. Dazheng Metal Fibre Co., Ltd.*,
 133 F. Supp. 3d 1079 (N.D. Ill. 2015) ....................................................................................... 7

*In re Broiler Chicken Antitrust Litig.*,
 No. 1:16-CV-08637, 2020 WL 3469166 (N.D. Ill. June 25, 2020) .......................................... 12

*In re Chrysler Pacifica Fire Recall Products Liab. Litig.*,
 737 F. Supp. 3d 611 (E.D. Mich. 2024) ................................................................................... 12

*Johnson v. Jung*,
 242 F.R.D. 481 (N.D. Ill. 2007) ................................................................................................. 9

*Reed v. Illinois*,
 318 F.R.D. 77 (N.D. Ill. 2016) ................................................................................................. 15

*Richards v. Pac. Gas & Elec. Co.*,
 No. EDCV 17-471-DMG-KK, 2017 WL 10592150 (C.D. Cal. Oct. 27, 2017) ......................... 7

*Schoor v. Briarwood Estates Ltd. P'ship*,
 178 F.R.D. 488 (N.D. Ohio 1998) ............................................................................................. 7

*Stanek v. St. Charles Comm. Unit Sch. Dist. # 303*,
 No. 13 C 3106, 2020 WL 1304828 (N.D. Ill. Mar. 19, 2020) ...................................... 7, 12, 13

**Rules**

Fed. R. Civ. P. 26(c)(1) ................................................................................................................. 7

Respondent William Francis respectfully submits this Memorandum of Law in Opposition to Petitioners Daniel Ferrari and Charlene Ferrari's Motion to Quash Subpoenas and for Protective Order. For the reasons set forth below, the Court should deny Petitioners' Motion in its entirety.

## I.    INTRODUCTION

Petitioners Daniel and Charlene Ferrari seek to shield themselves from depositions in a case that centers on a company they founded, funded, and ostensibly controlled—Phoenix Energy One LLC ("Phoenix").[1] Their motion, however, relies on generalized health concerns and unsupported claims of burden, while ignoring Respondent's willingness to provide broad accommodations. The Motion also rests on the false premise that they are peripheral witnesses with little to offer; yet the record shows otherwise.

Phoenix is not a distant business interest of the Ferraris; it is a company they formed immediately after their son, Adam Ferrari, was terminated from his prior position as the CEO of another oil and gas company amid felony theft charges. Through an entity they own and control, at least on paper, Lion of Judah Capital, LLC ("LJC"), Phoenix received over $1.1 million in startup capital, while Daniel and Charlene Ferrari were positioned as Phoenix's formal and record owner and "managers."[2] But the evidence reveals that Adam Ferrari, not his parents, exercised de facto control over Phoenix from day one, and was the source of LJC's capital. Despite sworn statements denying any executive role, Adam Ferrari signed key documents as "Manager," routinely directed company operations, and made high-level decisions—often using digital

---

[1] Phoenix Energy One, LLC was formerly known as Phoenix Capital Group Holdings, LLC. The company announced the name change on January 24, 2025. *See CEO Adam Ferrari on Changing Our Name to Phoenix Energy*, https://phoenixenergy.com/post/2025/01/24/ceo-adam-ferrari-on-the-changing-our-name-to-phoenix-energy/. The name change occurred shortly after Forbes published an extremely unflattering article about Phoenix. https://www.forbes.com/sites/brandonkochkodin/2024/10/08/buyer-beware-these-yield-gushing-oil-bonds-could-derail-your-retirement/.

[2] LJC is the majority owner of Phoenix, and Daniel and Charlene Ferrari are LJC's sole members/managers.

– 1 –

credentials tied to Daniel Ferrari. This web of misrepresentation goes directly to the heart of Respondent's truth-based defense in the underlying defamation action.[3]

Efforts to obtain this information through other means have been stymied at every turn—by Phoenix's executives, by LJC's refusal to produce basic corporate records, and by obstructive discovery tactics. Petitioners now attempt to block depositions that are plainly necessary to uncover the facts and prepare for a trial for which Petitioners will be beyond subpoena range. Yet they fail to meet the "heavy burden" imposed by Rule 26(c), offering only conclusory assertions and speculative risks, while ignoring Respondent's offer of broad accommodations. The law does not permit a witness to avoid deposition merely by claiming discomfort, especially where—as here—the witness holds firsthand knowledge of facts central to the claims and defenses in dispute, and indeed, *created* the factual necessity for the deposition. The motion should be denied.

## II.     FACTUAL BACKGROUND

Daniel and Charlene Ferrari are not marginal or incidental witnesses. They are the founders and majority owners of Phoenix, the entity at the center of the underlying litigation. Koonce Dec., attached as **Exhibit A** ¶ 4. Their son, Adam Ferrari, is the plaintiff in the underlying defamation suit, who has sued Mr. Francis for stating that Ferrari was Phoenix's CEO and in control of it, and is a felon.[4] Yet, substantial evidence demonstrates that Adam Ferrari has exercised complete de

---

[3] The underlying litigation centers on Adam Ferrari's claim that Respondent William Francis defamed him by stating that he (1) is a convicted felon and (2) secretly controls Phoenix as its then-unnamed CEO. Respondent's core defense is truth—specifically, that both statements are substantially true in their gist since (a) Mr. Ferrari did indeed plead guilty to felony theft charges in 2019, (b) he has since, as of November 2023, officially been named as Phoenix's CEO, and (c) he has exercised functional executive control over the company from its formation. However, Adam Ferrari contends that (prior to being officially named as CEO) he had never managed Phoenix and that it is Daniel and Charlene Ferrari—not Adam—who control Phoenix. In other words, Adam Ferrari has placed his parents' purported control squarely at issue.

[4] *See Ferrari v. Francis*, No. 3:23-cv-00455 (N.D. Tex.) (the "Underlying Lawsuit"), Dkt. 7; ECF No. 3-3. The Underlying Case is set for trial on a three-week docket, the week of September 15, 2025. Underlying Lawsuit, Dkt. 71. Although discovery closed on April 7, 2025 [*see* Underlying Lawsuit, Dkt. 71], the parties have agreed to extend the deadline to permit the depositions of Daniel and Charlene Ferrari, if the Court denies the Motion.

facto control over Phoenix since its inception, while taking extraordinary steps to obscure that control, including through use of his parents and their purported ownership and control over Phoenix. Ex. A ¶ 5. The testimony of Daniel and Charlene Ferrari is therefore directly relevant— not only to the nature of Phoenix's ownership and capitalization, but also to whether Adam Ferrari's claimed lack of executive authority is truthful or even credible.

Phoenix was formed in April 2019, weeks after Adam Ferrari was terminated from his prior company, Wolfhawk Energy (later renamed Petram Group), following his arrest on 14 felony counts relating to fraudulent use of forged mineral deeds. Ex. A ¶ 5; Ex. A-2. Adam Ferrari ultimately pleaded guilty to felony theft arising out of that scheme, through which he attempted to defraud mineral owners and operators out of more than $300,000. Ex. A ¶ 6; Ex. A-2. Following his ouster, Adam Ferrari founded Phoenix, which was set up through a corporate structure that obscured his ownership by placing control, at least on paper, in his parents' hands. Ex. A ¶ 7; Ex. A-2. Daniel and Charlene Ferrari formed and purportedly held all control over LJC, the entity that contributed more than $1.1 million in startup capital to Phoenix—making it the sole capital-contributing owner. Ex. A ¶ 7; Ex. A-1, A-3. Years later, Phoenix disclosed that Adam Ferrari was, in fact, the *sole* economic interest holder of LJC, meaning he is the only source of any "economic" value LJC invested in Phoenix and has an indirect ownership interest in Phoenix through LJC and his parents. Ex. A ¶ 8.

Meanwhile, in sworn affidavits, Adam Ferrari repeatedly denied that he founded, organized, owned, or controlled Phoenix. He has insisted under oath that he merely "consulted" for the company starting in 2021, and only at the request of his parents. Ex. A-11; Ex. A-5 (Consulting Agreement dated November 1, 2021). These denials have since been undermined by contradictory evidence. Ex. A ¶¶ 10–14. For example, in a 2021 loan application to First

International Bank & Trust ("FIBT"), Adam Ferrari identified himself as Phoenix's "President" and "Manager." Ex. A ¶ 10; Ex. A-6. He maintained and used a Phoenix email address for years. Ex. A ¶ 11. He directly managed Phoenix's broker-dealer relationship with Dalmore Group, threatened to terminate them, imposed deadlines, and issued instructions on Phoenix's behalf using language consistent with executive authority—not independent engineering support. Ex. A ¶ 11; Ex. A-7.

Adam Ferrari also played a central role in honing Phoenix's investor onboarding process, dictated compliance procedures, and personally solicited loans on Phoenix's behalf—all before he was ever officially employed[5] by Phoenix and well before Phoenix formally named him as its CEO in late 2023. Ex. A ¶¶ 10–11; Ex. A-7. His fingerprints are on performance reviews of senior executives, marketing content, and even DocuSign transactions, where he repeatedly signed as Phoenix's "Manager." Ex. A ¶¶ 11–12; Ex. A-7, A-8. These signatures frequently occurred within seconds of Daniel Ferrari's electronic signatures, often from the same location in California and IP address—despite Adam Ferrari's admissions to FIBT that his father was physically incapable of typing due to quadriplegia. Ex. A ¶¶ 12; Ex. A-8. These facts strongly suggest that Adam Ferrari signed documents using Daniel Ferrari's credentials, raising further questions that only Daniel and Charlene Ferrari can answer. Ex. A ¶¶ 12, 20.

---

[5] Phoenix first officially employed Adam Ferrari as its Vice President of Engineering in April 2023. *See* Phoenix's SEC Form 1-K/A, filed March 27, 2025 ("Adam has served in an advisory role at various points for Phoenix and as of April of 2023, Adam was promoted to VP of Engineering for the company."); Employment Agreement, dated April 17, 2023. Prior to that, Phoenix maintained that Ferrari served solely as a "consultant" pursuant to a Consulting Agreement purportedly executed in November 2021. Ex. A-5. Charlene and Daniel Ferrari both signed that agreement as managers of LJC. Ex. A-5. The agreement characterizes Ferrari's role as a "Petroleum Engineering Consultant" responsible for providing "engineering support" and advising Phoenix's executive team on technical evaluations and drilling techniques. Ex. A-5. Notably, it does not reflect the expansive executive functions Ferrari has exercised in practice since Phoenix's formation in April 2019. Ex. A ¶ 11.

Counsel for Phoenix has also insisted that Daniel Ferrari is "mentally competent" and capable of overseeing corporate operations despite his paralysis, and criticized the notion that a person with such a condition is inherently unfit to manage a company.[6] Ex. A ¶ 9; Ex. A-4.

Critically, neither Daniel nor Charlene Ferrari has been forthcoming in explaining their roles or oversight of Adam Ferrari's actions on behalf of Phoenix. Ex. A ¶¶ 17–19. In the face of repeated discovery delays, boilerplate objections, and refusal to produce even public-facing documents without burdensome "Attorney's Eyes Only" ("AEO") designations, Mr. Francis has had no choice but to seek direct testimony. Ex. A ¶¶ 17–18. Notably, the same counsel represents Petitioners, Adam Ferrari, Phoenix, and LJC—a unified front that has utilized a coordinated strategy of obstruction at every turn, including resisting basic document discovery and now seeking to avoid depositions entirely. Ex. A ¶¶ 16–19. In light of this pattern, Petitioners' refusal to testify only reinforces the importance of their depositions to uncover and expose core facts—such as whether Daniel Ferrari signed Phoenix documents independently, whether Charlene Ferrari participated in key decisions, and whether either knowingly permitted Adam to run Phoenix under their names while denying he was doing so. Ex. A ¶¶ 12, 18–20.

Phoenix's own executives—Lindsey Wilson, Curtis Allen, and others—have also assisted in obscuring or concealing Adam Ferrari's role. Ex. A ¶¶ 13; Exs. A-9, A-10. Mr. Allen signed an affidavit swearing that Adam Ferrari had "never managed Phoenix, served as or held any executive position for Phoenix, or had authority to bind or make decisions on behalf of Phoenix," yet in private emails Allen referred to Ferrari as the company's "owner." Ex. A ¶ 14; Ex. A-12. Lindsey Wilson likewise testified in related litigation that Adam Ferrari had "never had authority to act on

---

[6] In the Underlying Lawsuit, Ferrari, like Phoenix in two other related lawsuits, has burned through six different law firms. *See Ferrari v. Francis*, Cause No. 3:23-cv-00455 (N.D. Tex.).

behalf or bind Phoenix" and had "never been an executive of Phoenix." Ex. A ¶ 13; Ex. A-9. But Chris Masone, a founding executive of Phoenix, testified that Adam Ferrari acted like an executive and owner of Phoenix. Ex. A ¶ 15; Ex. A-13. The sworn accounts from current Phoenix executives (Wilson, Allen, and others), which conflict with discovery obtained so far [*see* Ex. A ¶¶ 10–12, 14], thus underscore the importance of obtaining testimony from the individuals most likely to know the truth and perhaps less incentivized to perpetuate concealment—Daniel and Charlene Ferrari. Ex. A ¶ 20. Daniel and Charlene Ferrari's depositions are not only justified—they are essential. Adam Ferrari and/or his parents chose Phoenix's corporate structure, chose to assert in litigation and in SEC filings that Daniel and Charlene are Phoenix's "founders" and the "member managers" in control of it, and chose to deny that Adam Ferrari had authority over the company.[7] They also chose to sue Mr. Francis for defamation based squarely on whether Adam Ferrari was factually Phoenix's CEO—a dispute that rests implicitly on whether Adam Ferrari rather than his parents controlled and capitalized Phoenix.[8] Assertions by all three Ferrari family members place Daniel and Charlene Ferrari at the center of Phoenix's legal and operational framework. Those same assertions and activities make Daniel and Charlene Ferrari key fact witnesses whose testimony is vital to defending the baseless claims brought, repeatedly, by Adam Ferrari and Phoenix and assessing the veracity of the central allegations in this case. Ex. A ¶ 20.

---

[7] *See* Underlying Lawsuit, Dkt. 39, p. 4 ("This case is part of the nationwide response to a flurry of attacks on Adam Ferrari and the business his father owns, Phoenix Capital Group Holdings, LLC"); *see also Ferrari, et al. v. Forbes Media LLC*, No. 1:25-cv-00012-GB (D. Del.), Dkt. 1-1, p. 10 (describing Phoenix as "a family-owned company started by [Adam] Ferrari's father"); Phoenix's SEC Form 1-K, filed April 1, 2025 ("Daniel Ferrari and Charlene Ferrari each own 50% of the voting membership interests in, and are the managers of, LJC.").

[8] Indeed, Phoenix (while purportedly owned and controlled by Daniel and Charlene Ferrari) has sued Mr. Francis and his company twice for defamation based on the exact same assertions, that Adam Ferrari was at all times its de facto CEO and in control despite his felony background. Phoenix recently dismissed the latest of those suits, filed in the District of North Dakota. *See Phoenix Capital Group Holdings, LLC v. Incline Energy Partners, LP.*, No. 23-CV-00209 (D.N.D.), Dkt. 56 (Plaintiff's Notice of Voluntary Dismissal), Dkt. 37 (Defendant's Response to Plaintiff's Motion for Leave to File Amended Complaint—explaining the basis of that lawsuit and the status of briefing, including multiple motions to dismiss).

### III.  LEGAL STANDARD

Protective orders may address "matters relating to a deposition" and that a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1). However, the Court may only issue such an order "for good cause." *Id.* "The party seeking a protective order bears the burden of demonstrating why the order should be entered." *Stanek v. St. Charles Comm. Unit Sch. Dist. # 303*, No. 13 C 3106, 2020 WL 1304828, at *3 (N.D. Ill. Mar. 19, 2020) (citing *Global Material Techs., Inc. v. Dazheng Metal Fibre Co., Ltd.*, 133 F. Supp. 3d 1079, 1084 (N.D. Ill. 2015)). That burden "is quite heavy." *Stanek*, 2020 WL 1304828, at *3. "'A prohibition against taking an oral deposition is a very unusual procedure and a party who seeks a protective order prohibiting such a deposition bears a heavy burden of demonstrating good cause for such an order.'" *Id.* (quoting *Armstrong v. MGC Mortg., Inc.*, No. 1:09-CV-00131, 2010 WL 3835703, at *2 (N.D.W. Va. Sept. 28, 2010)).

"Where, as here, a party seeking to bar an oral deposition based on health-related concerns, that party must 'make a specific and documented factual showing that the deposition would be dangerous to the deponent's health.'" *Stanek*, 2020 WL 1304828, at *3 (quoting *Richards v. Pac. Gas & Elec. Co.*, No. EDCV 17-471-DMG-KK, 2017 WL 10592150, at *2 (C.D. Cal. Oct. 27, 2017); *Schoor v. Briarwood Estates Ltd. P'ship*, 178 F.R.D. 488, 491 (N.D. Ohio 1998). In other words, "the moving party carries the substantial burden of showing 'extraordinary circumstances based on specific facts that would justify such an order.'" *Campos v. Webb Cnty. Tex.*, 288 F.R.D. 134, 136 (S.D. Tex. 2012) (quoting *Jennings v. Family Mgmt.*, 201 F.R.D. 272, 275 (D.D.C. 2001)). And "[c]onclusory or speculative statements about the harm that will be suffered—even if made by a treating physician—are insufficient to support entry of a protective order barring an oral deposition." *Stanek*, 2020 WL 1304828, at *3 (first citing *Arnold v. Wausau Underwriters Ins.*

*Co.*, No. 13-60299-CIV, 2013 WL 5488520, at *2 (S.D. Fla. Sept. 30, 2013), and then citing *Campos*, 288 F.R.D. at 136).

## IV. ARGUMENT

### A. Petitioners Possess Unique and Highly Relevant Information.

Petitioners are not ordinary third parties with peripheral involvement. They do not dispute the relevance of their testimony. They are Phoenix's founders and owners, intimately (or perhaps not) involved in its structure and operation. Ex. A ¶¶ 4, 7–8. Their knowledge and activities are not only relevant but essential to test and impeach sworn denials[9] by Adam Ferrari and Phoenix executives concerning Adam's role in the company. These facts and Petitioners' testimony bear directly on Respondent's affirmative defense of truth concerning Adam's de facto control of Phoenix, as well as the credibility of other key witnesses who Ferrari will offer in support of his claim at trial. Ex. A ¶¶ 10–16; Exs. A-5 to A-10. Discovery to date—including emails and documents obtained from DocuSign—has revealed that Adam Ferrari exercised de facto control over Phoenix, despite repeated efforts to conceal this reality. Ex. A ¶¶ 11–14; Exs. A-6 to A-7, A-11. Petitioners' paper ownership of Phoenix[10] through LJC lies at the very heart of how Adam was able to pull the strings at Phoenix for years without disclosing his role. Ex. A ¶¶ 4, 7–8. Respondent

---

[9] For example, Adam Ferrari submitted a sworn declaration in a related state court case filed by Phoenix against Mr. Francis and his company, based on the same assertions at issue here, swearing as follows: "To supplement my income from Ferrari Energy while utilizing my knowledge and expertise in the oil and gas industry, I began working with Phoenix in 2021 as a consultant. <u>Prior to 2021, I advised Phoenix informally at the request of my parents, Daniel and Charlene Ferrari, who own Lion of Judah Capital, LLC, the majority owner of Phoenix</u>. . . . My position and role at Phoenix, unlike my position and role at Ferrari Energy, is not in an executive capacity. Indeed, I have never served as an executive of Phoenix, including as Phoenix's CEO or chief executive officer, and **I have never managed Phoenix** or had authority to bind or make decisions on behalf of Phoenix." (emphasis added).

[10] Notably, [recent SEC filings](#) have revealed that Adam Ferrari retains **100%** of the economic interest and benefits of LJC. ("Daniel Ferrari and Charlene Ferrari each own 50% of the voting membership interests in, and are the managers of, LJC. Adam Ferrari, our Chief Executive Officer and the son of Daniel and Charlene Ferrari, owns 100% of the economic interests in LJC, but has no voting or managerial interest in LJC.").

– 8 –

must be entitled to depose witnesses with the most direct knowledge of these facts, and indeed the witnesses who participated most closely with Adam in creating the subterfuge at issue.

The evidence uncovered to date undermines the narrative offered by Phoenix's executives and exposes Adam Ferrari's true role in the company, a central issue, if not *the* central issue in Ferrari's claim. That issue cannot be resolved without testimony from the people Adam Ferrari himself put in control. The ownership structure he chose—placing his elderly parents, Daniel and Charlene Ferrari, in formal control of LJC and Phoenix—was a deliberate design that allowed Adam to exert authority while distancing himself publicly. Ex. A ¶¶ 7–8, 20. That very structure now makes Daniel and Charlene Ferrari essential witnesses. They are the only individuals who can credibly speak to whether the actions Adam Ferrari undertook were authorized, whether they knowingly permitted him on their behalf, and whether the formal ownership they hold reflected actual control. Ex. A ¶ 20. Mr. Francis is entitled to depose them to obtain this information.

**B.      Testimony from Phoenix Executives Is Patently Insufficient as a Substitute.**

Petitioners' assertion that others may possess similar or superior knowledge is insufficient to quash their depositions. Courts reject attempts to evade deposition even where the party seeking relief denies firsthand knowledge of material facts. *See Johnson v. Jung*, 242 F.R.D. 481, 483 (N.D. Ill. 2007) (a putative deponent's affidavit denying personal involvement or knowledge is insufficient to preclude discovery if it does not say that she has no information regarding the matters at issue). Here, Petitioners do not deny they possess direct knowledge of key facts, they merely contend that Mr. Francis should seek those answers elsewhere. But Petitioners' direct involvement in Phoenix's formation, their financial stake, and their interactions with Adam Ferrari make them indispensable witnesses. Ex. A ¶¶ 4–5, 7–9, 18.

Nor can Respondent obtain this information from other Phoenix Executives. Only Petitioners can speak to LJC's formation, operations, distributions, and capitalization, and why

they chose to create and fund a company, indirectly, at which their son's role was concealed. Ex. A ¶¶ 4, 7–9, 18, 20. And because LJC owns a majority share of Phoenix, Petitioners alone, again at least on paper, have possessed the power to unilaterally control Phoenix, although that power (and financial benefit)—potentially as directed or authorized by Respondents—appears to have flowed directly to Adam Ferrari. Ex. A ¶¶ 4, 8–9, 15. And only Petitioners can testify regarding their past travel and whereabouts, which speaks to whether Adam signed documents and emails— through DocuSign and from California IP addresses—on their behalf. Ex. A ¶¶ 12; Exs. A-8. Phoenix's own counsel, in defending the Ferraris' purported managerial roles, confirmed that Daniel Ferrari remains mentally competent to oversee LJC's day-to-day operations despite his paralysis. Ex. A ¶ 9; Ex. A-4. That admission cuts directly against any narrative (offered in resistance to these depositions) that Daniel and Charlene are mere figureheads—and underscores the need for their sworn testimony about whether they authorized or were even aware of Adam's conduct.

Moreover, Phoenix's executives have already demonstrated a propensity to bend the truth about Adam's role at Phoenix. Ex. A ¶ 13; Exs. A-9, A-10. Lindsey Wilson, for example, has submitted an affidavit in state court swearing, "Mr. Ferrari does not, and has never had, authority to act on behalf or bind Phoenix" and that he "is not, and has never been, an executive of Phoenix, especially its chief executive." Ex. A-9. So has Curtis Allen. Ex. A-10. Adam Ferrari and Curtis Allen even went so far as to swear that Adam Ferrari "never managed Phoenix." Ex. A-10, A-11.

But those carefully worded sworn statements have proved to be false—or at the very least highly misleading. In reality, Adam Ferrari has repeatedly acted as Phoenix's manager: he solicited multiple loans for the company, signed documents as Phoenix's "Manager," and even personally guaranteed a $3 million loan from ANB Bank to LJC, the entity that formally owns and controls

Phoenix. Ex. A ¶¶ 10–12, 14; Exs. A-6, A-7 A-8. Further confirming this, Chris Masone—an original founding member of Phoenix—testified in deposition that Adam Ferrari held a "high-level role within Phoenix," equivalent to an executive position, and he "acted like an owner." Ex. A ¶ 15; Ex. A-13. Petitioners contend he should depose Phoenix's executives instead, but understandably, Respondent has little confidence in obtaining truthful testimony there, nor should he be forced to accept only the witnesses Mr. Ferrari proffers in proving facts that are hotly disputed. *See* Ex. A ¶¶ 13, 19. Respondent must be permitted to depose Petitioners—not just other Phoenix executives.

**C.    Petitioners' health concerns do not justify quashing the depositions because they fail to show that the depositions cannot safely take place with accommodations.**

Respondent does not dispute that Daniel Ferrari lives with serious medical conditions and fully acknowledges the importance of approaching any deposition with sensitivity to those health issues. That is precisely why, when Respondent first conferred about dates for these depositions, he offered flexibility and accommodations designed to minimize any burden on Mr. or Mrs. Ferrari. *See* ECF No. 3-5, p. 7 ("If leaving his home is difficult for Mr. Ferrari and the home would accommodate a video deposition, we could notice the depositions for the Ferraris' home. We have no interest in making this more difficult for them than it needs to be[.]"). To that end, Respondent reiterates willingness to depose the Ferraris at any location of their choosing (including their home), with any requested medical monitoring, and with full flexibility on timing—such as limiting the depositions to a shortened duration and allowing for ample, frequent breaks.

Despite these good-faith efforts, Petitioners have categorically refused to consider any accommodations at all. Instead, they seek to bar the depositions entirely, without offering a single medical opinion stating that Mr. Ferrari is unable to participate under the conditions proposed. Their motion relies solely on generalized concerns and speculative harm, without any supporting

– 11 –

documentation from a treating physician or explanation for why accommodations would be insufficient. It also flies in the face of their purported ability to manage and control Phoenix and LJC; the very issue underlying their son's claim against Respondent—a claim made possible by Petitioners through their ownership and managerial control over LJC and Phoenix.

Courts have permitted depositions under modified conditions, including remote appearances, limited questioning periods, and scheduled breaks. *See In re Broiler Chicken Antitrust Litig.*, No. 1:16-CV-08637, 2020 WL 3469166, at *3 (N.D. Ill. June 25, 2020) (stating during the COVID-19 pandemic that "accommodation is the answer here rather than a complete cessation of discovery activity"); *Campos*, 288 F.R.D. at 139 (denying motion for protective order to preclude deposition on health grounds but ordering the deponent to "include the particular safeguards that would allow the deposition to proceed in the most medically appropriate manner"); *In re Chrysler Pacifica Fire Recall Products Liab. Litig.*, 737 F. Supp. 3d 611, 620 (E.D. Mich. 2024) (specifying the terms for the deposition, including time and place, due to the plaintiff's role as the sole caretaker for his elderly mother).

Even crediting the concerns raised in Charlene Ferrari's affidavit, Petitioners' Motion falls short of meeting the "specific and documented factual showing" for precluding a deposition on health-related grounds. *Stanek v. St. Charles Cmty. Unit Sch. Dist. 303*, No. 13 C 3106, 2020 WL 1304828, at *3 (N.D. Ill. Mar. 19, 2020). That requires "extraordinary circumstances based on specific facts," not generalized concerns or subjective fears. *Campos v. Webb Cnty. Tex.*, 288 F.R.D. 134, 136 (S.D. Tex. 2012).

Charlene Ferrari's affidavit states that Mr. Ferrari suffers from "autotomic dysflexia"[11] and a spastic bladder and references general risks that may arise from stress or prolonged sitting. ECF No. 3-4 ¶¶ 18, 20. However, it offers no medical opinion as to the severity of Mr. Ferrari's condition, the actual risk posed by a deposition, or why accommodations like breaks, remote participation, or medical supervision would not sufficiently address those concerns. The affidavit simply concludes that a deposition would be "extremely detrimental" and "dangerous," without any medical opinion or further factual support. ECF No. 3-4 ¶ 21.

This is not enough. Courts have made clear that "conclusory or speculative statements about the harm that will be suffered—even if made by a treating physician—are insufficient to support entry of a protective order barring an oral deposition." *Stanek*, 2020 WL 1304828, at *3. Petitioners have barely even provided that much. Their Motion does not include or even reference the opinion of or consultation with any professional medical professional and wholly ignores the effect of accommodations. For example, Petitioners have provided no reason why frequent breaks, limited duration, and medical monitoring are insufficient to mitigate stress-related or spastic bladder concerns. On this record, the Motion amounts to speculation dressed as certainty, and cannot justify the extraordinary relief they seek.

### D.  Respondent Has Pursued Alternative Discovery Without Success.

Respondent has already sought discovery from other sources, including Phoenix and Petitioners' company, LJC, yet key information regarding Adam Ferrari's involvement and Petitioners' role in creating the structure through which his involvement was concealed is needed and has been withheld. Petitioners' suggestion that Respondent should exclusively rely on

---

[11] As best as Respondent can tell, Petitioners meant "Autonomic Dysreflexia." It appears there is no medical condition known as "autotomic dysflexia."

Phoenix's executives is unpersuasive, as they do not possess the same firsthand knowledge as Petitioners.

Petitioners' contention that Francis should seek discovery from other sources—such as Phoenix or its executives—ignores that other avenues have already been pursued and have failed to yield the information necessary to test the claims and defenses in this litigation. Respondent has served targeted subpoenas on Phoenix and on Petitioners' own entity, LJC, but in response, LJC produced no documents and asserted a host of boilerplate objections—objecting to virtually every request as overbroad, burdensome, irrelevant, or duplicative of publicly available information. Ex. A ¶ 18; Ex. A-14. LJC even refused to produce foundational corporate documents such as its formation and governance records, ownership disclosures, and documents concerning the $1.1 million in startup capital it provided to Phoenix—capital which the record now shows likely originated from Adam Ferrari himself.[12] Ex. A ¶¶ 7–8, 18; Exs. A-2, A-14.

For example, in response to a request for documents identifying LJC's members and managers—central to assessing Adam Ferrari's control over Phoenix—LJC refused to produce anything, asserting that the information was irrelevant and "burdensome" to collect. Ex. A ¶ 18; Ex. A-14. Similarly, when asked to produce documents relating to the origin of the capital it provided to Phoenix or any transfers made to or from Adam Ferrari, LJC flatly refused to search for or produce any materials. Ex. A ¶ 18; Ex. A-14. This obstructionist posture has been a pattern throughout this case. Ex. A ¶ 19. Even Phoenix itself—under Adam Ferrari's direction—resisted producing basic public documents (such as public SEC filings and DocuSign records) without burdensome AEO designations that have taken over a year to resolve. Ex. A ¶ 17.

---

[12] On May 1, 2023, Phoenix admitted in SEC filings that Ferrari was the "economic interest owner of [LJC]" which is Phoenix's sole capital contributing shareholder according to Phoenix's LLC Agreement, and eventually admitted that Ferrari is the **only** economic interest holder and "owns 100% of the economic interests in LJC." Ex. A ¶ 8.

In short, Petitioners and their closely affiliated entities have erected wall after wall to prevent meaningful discovery into Adam Ferrari's role in Phoenix, while yet pressing claims based on the allegedly false premise that Adam was never in control of Phoenix. This backdrop forced Respondent to seek the depositions of Daniel and Charlene Ferrari. Their depositions are essential.

In sum, Petitioners' refusal to engage in document discovery only underscores the necessity of their depositions. Written discovery has been tried and stonewalled. And critical issues—ranging from ownership and capitalization to control and delegation of authority, not to mention credibility—are largely unexplored and undiscovered. This Court should reject Petitioners' attempt to shield themselves from deposition while simultaneously controlling and indeed creating, the facts at issue from behind the scenes.

### E. Petitioners' Burden Argument Is Insufficient to Justify Quashing the Depositions.

Petitioners have not shown that the depositions impose an undue burden beyond general inconvenience. Courts routinely deny motions to quash where deponents claim difficulty but fail to demonstrate that the burden outweighs the requesting party's need for the testimony. *See Reed v. Illinois*, 318 F.R.D. 77, 79–81 (N.D. Ill. 2016) (denying motion to quash a nonparty deposition subpoena arguing undue burden and health concerns and stating that "[n]on-parties are not exempt from the basic obligation of all citizens to provide evidence of which they are capable upon appropriate request"). The request for a protective order should similarly be denied, as Respondent is entitled to explore Petitioners' knowledge through deposition testimony.

### V. CONCLUSION

For the reasons set forth above, the Court should deny Petitioners' Motion to Quash Subpoenas and for Protective Order. With reasonable accommodations, these depositions can and should proceed.

Respectfully submitted,

By: */s/ Kevin B. Duff*
    Kevin B. Duff
     IL Bar No. 6210491
     kduff@rdaplaw.net
    RACHLIS DUFF & PEEL, LLC
    542 S. Dearborn Street, Suite 900
    Chicago, IL 60605
    Tel. 312.733.3390


By: */s/ Charlene C. Koonce*
    Cortney C. Thomas
     Texas Bar No. 24075153
     cort@brownfoxlaw.com
    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    Andrew C. Debter
     Texas Bar No. 24133954
     andrew@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX 75225
    Tel. 214.327.5000
    Fax. 214.327.5001

*Attorneys for Respondent William Francis*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

*/s/ Charlene C. Koonce*
Charlene C. Koonce