# EXHIBIT A-13

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION

 3        ADAM FERRARI,              )
                                     )
 4              Plaintiff,           )
                                     ) Civil Action No.
 5        v.                         ) 3:23-cv-00455-S
                                     )
 6                                   )
          WILLIAM FRANCIS,           )
 7                                   )
                Defendant.           )
 8

 9        ----------------------------------

10                  ORAL DEPOSITION OF

11          CHRISTIE "CHRIS" VINCENT MASONE

12                  APRIL 7, 2025

13                  VOLUME 1 OF 1

14        ----------------------------------

15

16

17         ORAL DEPOSITION OF CHRISTIE "CHRIS" VINCENT

18   MASONE, produced as a witness at the instance of the

19   DEFENDANT, and duly sworn, was taken in the above-styled

20   and -numbered cause on the 7th day of April, 2025, from

21   10:03 a.m. to 11:18 a.m., before Kristel L. Wilkins, CSR

22   in and for the State of Texas, reported by machine

23   shorthand, at the law offices of Brown Fox, PLLC, 8111

24   Preston Road, Suite 300, Dallas, Texas, pursuant to the

25   Federal Rules of Civil Procedure.
```



Christie Masone

April 07, 2025
Pages 2 to 5

---

## Page 2

```
1             A P P E A R A N C E S
2    FOR THE PLAINTIFF:
3           Mr. David Sillers
            CLARE LOCKE LLP
4           10 Prince Street
            Alexandria, Virginia 22314
5           202.899.3884
            david@clarelocke.com
6
            - and -
7
            Mr. Ross Good (Via Zoom)
8           THE GOOD LAW GROUP
            800 East Northwest Highway, Suite 814
9           Palatine, Illinois 60074
            847.577.4476
10          ross@thegoodlawgroup.com
11
12   FOR THE DEFENDANT:
13          Mr. Michael Baum
            Mr. Andrew Debter
14          BROWN FOX
            8111 Preston Road, Suite 300
15          Dallas, Texas 75225
            214.327.500
16          mbaum@brownfoxlaw.com
            andrew@brownfoxlaw.com
17
18
            FOR THE WITNESS:
19
            Ms. Michele H. Naudin
20          MUNCK WILSON MANDALA
            2000 McKinney Avenue, Suite 1900
21          Dallas, Texas 75201
            972.628.3600
22          mnaudin@munckwilson.com
23
24
25
```

## Page 3

```
1                 I N D E X
2    Appearances.............................Page 2
3    Exhibit List............................Page 4
4    Examination by Mr. Baum.................Page 5
5    Examination by Mr. Sillers..............Page 40
6    Further Examination by Mr. Baum.........Page 44
7    Signature and Corrections...............Page 46
8    Reporter's Certificate..................Page 47
9
```

## Page 4

```
1              E X H I B I T   L I S T
2    No.   Description                         Page
                                               Marked
3
4    1       8/29/19 E-Mail from Masone to Singer, et al.
             (TPG00014-15)                        32
5
```

## Page 5

```
1              P R O C E E D I N G S
2    (Witness sworn.)
3         THE REPORTER:  Counsel, any stipulations
4    or agreements for the record?
5         MR. SILLERS:  We were going to do a Zoom,
6    I think, with my co-counsel.  We talked about that.
7         MR. BAUM:  You're right, we did.
8         THE REPORTER:  Do you want to go off?
9         MR. SILLERS:  Sorry.  I threw a monkey
10   wrench in it.
11        THE REPORTER:  Do you want to go off?
12        MR. BAUM:  Yeah, let's go off.
13        (Break taken from 10:04 to 10:08.)
14        (Mr. Good joined via Zoom.)
15        THE REPORTER:  Were there any stipulations
16   or agreements for the record?
17        MR. SILLERS:  Not any different than the
18   rest of the depositions.
19        MR. BAUM:  Fair enough.
20        CHRISTIE "CHRIS" VINCENT MASONE,
21   having been first duly cautioned and sworn to testify
22   the truth, the whole truth and nothing but the truth,
23   testified on his oath as follows:
24             E X A M I N A T I O N
25   BY MR. BAUM:
```



Christie Masone

April 07, 2025
Pages 6 to 9

Page 6

1    Q.   Would you please state your full name for the
2    record.
3        A.   Christie Masone.
4        Q.   Mr. Masone, you understand I'm an attorney
5    representing William Francis in a lawsuit filed against
6    him by Adam Ferrari?
7        A.   Yes.
8        Q.   You understand the court reporter to your
9    right has just administered an oath to you so that the
10   testimony you give here today has the same force and
11   effect as if you were testifying down at the courthouse?
12       A.   Yes.
13       Q.   Just a few ground rules to make things run a
14   little smoother.  A lot of times in everyday
15   conversation, you're going to know where I'm going with
16   my question before I can spit it out, but if we start
17   talking over each other, it's going to make it hard for
18   the court reporter to take down a clear record.
19           So will you please wait for me to finish my
20   question before you begin your answers?
21       A.   Yes.
22       Q.   You're doing a great job of giving verbal
23   answers.  The court reporter cannot take down huh-uhs
24   and uh-huhs and nodding the head and that sort of thing,
25   so will you continue to please give those verbal

Page 7

1    answers?
2        A.   Yes.
3        Q.   Importantly, if you -- there is a question I
4    ask you that you don't understand, would you -- at any
5    time, would you please let me know so I can have a
6    chance to rephrase?
7        A.   Yes.
8        Q.   It's not an endurance contest.  I don't think
9    we're going to be here all that long, but if you feel
10   like you need a break anytime -- at any time, let me
11   know, and I'm happy to accommodate, okay?
12       A.   Yes.
13       Q.   All right.  Where do you currently reside?
14       A.   Prosper, Texas.
15       Q.   What's your address, sir, please?
16       A.   340 Darian Drive.
17       Q.   ZIP code?
18       A.   75078.
19       Q.   And what's your date of birth?
20       A.   8/13/79.
21       Q.   Have you ever given a deposition before like
22   what you're doing here today?
23       A.   Yes.
24       Q.   How many times?
25       A.   Once.

Page 8

1        Q.   And what occasioned the deposition?
2        A.   It was a business transaction for a previous
3    company that I had worked at.
4        Q.   Who were the parties to that lawsuit?
5        A.   Swan Energy and Robert Padula.
6        Q.   And what was your connection to the lawsuit?
7        A.   I was a sales representative for Swan Energy.
8        Q.   Where was that lawsuit filed?
9        A.   Texas.
10       Q.   Do you know what county?
11       A.   I do not.
12       Q.   City?
13       A.   I do not.
14       Q.   Where are those companies located?
15       A.   Swan Energy does not exist anymore.
16       Q.   Where was it located?
17       A.   Houston.
18       Q.   And what about Robert Padula?  Where does he
19   reside, or where does he live?  Do you know?
20       A.   I think North Carolina.
21       Q.   Do you know if it was a state court or federal
22   court proceeding?
23       A.   I do not.
24       Q.   Where are you from?
25       A.   Originally?

Page 9

1    Q.   Yes.
2    A.   New York.
3    Q.   Where did you -- did you go to high school?
4    A.   Yes.
5    Q.   Where?
6    A.   New Jersey.
7    Q.   Which high school?
8    A.   Christian Brothers Academy.
9    Q.   Did you graduate?
10   A.   Yes.
11   Q.   What year?
12   A.   '97.
13   Q.   And after high school, did you attend college?
14   A.   Yes.
15   Q.   Where?
16   A.   University of Colorado at Boulder.
17   Q.   Did you graduate?
18   A.   Yes.
19   Q.   What year?
20   A.   2001.
21   Q.   What was your degree in?
22   A.   Ethnic studies.
23   Q.   Is that a BS or a BA?
24   A.   BA.
25   Q.   Any postgraduate education?



Christie Masone

April 07, 2025
Pages 10 to 13

Page 10

1    A.   No.
2    Q.   Tell us what you've done professionally since
3  you graduated from college.
4    A.   I've been in sales.
5    Q.   For?
6    A.   24 Hour Fitness, Assurity Financial, General
7  Steel, Swan Energy.
8    Q.   Was -- sorry.  Go ahead.
9    A.   The Oil & Gas Asset Clearinghouse and now
10  Lapetco.
11    Q.   I'm sorry?
12    A.   Lapetco.
13    Q.   Can you spell that, please?
14    A.   L-a-p-e-t-c-o.
15    Q.   Was Swan Energy your first job in the oil and
16  gas/energy sector?
17    A.   Yes.
18    Q.   And did you -- for Swan Energy, the Oil & Gas
19  Asset Clearinghouse and Lapetco, were those all
20  sale-related roles?
21    A.   Yes.
22    Q.   Other than meeting with your attorneys, what
23  did you do to get ready for your deposition today?
24    A.   Nothing.
25    Q.   Did you review any documents?

Page 11

1    A.   No.
2    Q.   Have you spoken with anyone other than your
3  attorneys about the fact that you're going to be giving
4  a deposition here today?
5    A.   My boss.
6    Q.   You received a subpoena from my firm to appear
7  here today?
8    A.   Yes.
9    Q.   Prior to your receipt of that subpoena, were
10  you aware that there was a lawsuit going on between
11  Mr. Francis and Mr. Ferrari?
12    A.   Only the first time that I was handed a
13  subpoena.
14    Q.   Yeah.  That's my -- that was -- I didn't ask
15  it very well.
16        Prior to getting that subpoena which required
17  you to be here today, were you aware of this lawsuit?
18    A.   No.
19    Q.   Do you still have or have you retained any
20  e-mails or documents from your time at Phoenix?
21    A.   No.
22    Q.   And just to make sure we're being clear on
23  terminology, when I say Phoenix, you'll understand that
24  to mean Phoenix Capital Group Holdings, LLC?
25    A.   Yes.

Page 12

1    Q.   Do you know Adam Ferrari?
2    A.   Yes.
3    Q.   When was the last time you spoke with him?
4    A.   When I was handed my subpoena.
5    Q.   Did you call him up?
6    A.   Did I call him?
7    Q.   Yes.
8    A.   Yes.
9    Q.   And tell me, what did you-all talk about?
10    A.   That I received a subpoena and that I was
11  going to get an attorney.
12    Q.   Anything else?
13    A.   No.
14    Q.   Did he talk to you about the substance of the
15  lawsuit at all?
16    A.   No.
17    Q.   Did you ask him?
18    A.   No.
19    Q.   Why did you call him?
20    A.   Because it has to do with him.
21    Q.   And so when did this call occur?
22    A.   The day I was handed the subpoena.
23    Q.   Just so I'm clear, I want you to share with me
24  everything you can recall telling him and everything he
25  told you on that call.

Page 13

1    A.   Okay.
2    Q.   You told him you got a subpoena?
3    A.   Yes.
4    Q.   And what was his reply?
5    A.   I don't recall exactly, but, "Okay."
6    Q.   And then what?
7    A.   And then, "I'm going to get an attorney so
8  that I can go in for the deposition."
9    Q.   Why did you call him?
10    A.   Because it's about him.
11    Q.   How long did the call last?
12    A.   Maybe a minute.
13    Q.   You have his cell phone still?
14    A.   Yes.
15    Q.   Did Adam Ferrari have any role or involvement
16  in helping you find or retain your attorneys?
17    A.   No.
18    Q.   Is Adam Ferrari in any way funding your
19  attorneys' fees?
20    A.   No.
21    Q.   Okay.  So other than your attorneys and Adam
22  Ferrari, who have you spoken with either about this
23  lawsuit or the fact that you would be appearing for a
24  deposition here today?
25    A.   My boss.



Christie Masone

April 07, 2025
Pages 14 to 17

Page 14

1    Q.   At any time have you spoken with any of the
2  attorneys representing Adam Ferrari?
3    A.   No.
4    Q.   You were one of the founders of Phoenix?
5    A.   Yes.
6    Q.   Who are the other founders?
7    A.   Lindsey Wilson, Adam Josephson, Adam Ferrari.
8    Q.   And how did Phoenix come about?
9    A.   We were terminated from Ferrari Energy.
10   Q.   You say "we." Who is we?
11   A.   Myself and about 14 other people.
12   Q.   Okay. And how did that then -- how is that
13  part of the genesis to Phoenix?
14   A.   Reaching out to individuals who also were
15  terminated to find out what they may think of doing.
16   Q.   And so can you just tell me the story as fully
17  as you can about how Phoenix came to be?
18   A.   Got terminated. A few of us got together,
19  went to lunch, came up with an idea of starting a
20  company doing exactly what we were doing.
21   Q.   When you say a "few of us went to lunch," who
22  were the few of you that were at lunch?
23   A.   The three I named already.
24   Q.   And just to be clear, that's Lindsey --
25   A.   Lindsey Wilson, Adam Josephson, Adam Ferrari

Page 15

1  and myself.
2    Q.   Where was the lunch?
3    A.   Cherry Cricket.
4    Q.   I'm sorry?
5    A.   The Cherry Cricket in Cherry Creek, Colorado.
6    Q.   And so the four of you go to lunch, and tell
7  me about the discussion.
8    A.   What would you like to know?
9    Q.   What ideas were discussed in terms of the type
10  of business that you were going to form and what the
11  company was going to do, et cetera?
12   A.   The company was going to do what we did at
13  Ferrari Energy.
14   Q.   Which was?
15   A.   Reach out to individuals about purchasing
16  mineral rights.
17   Q.   What was your role at Ferrari Energy?
18   A.   I was a salesman.
19   Q.   Okay. And so -- and I'm not fussing, but I
20  asked you to list me your experience since college, and
21  I don't recall you listing Ferrari Energy before. Did
22  we just miss that one?
23   A.   Yes.
24   Q.   So I just want to make sure I've captured the
25  whole list.

Page 16

1    A.   Not a problem.
2    Q.   Your time and your experience in the oil and
3  gas industry, Swan Energy, Oil & Gas Asset
4  Clearinghouse, Lapetco, Ferrari Energy --
5    A.   That would not be the correct order.
6    Q.   Well, I tell you what. Let's go back. Give
7  me the full slate in order, please.
8    A.   That is the full slate. The only difference
9  is after Swan Energy was Ferrari.
10   Q.   Well, does Phoenix need to be on that list
11  then?
12   A.   Do you believe so?
13   Q.   I'm asking you.
14   A.   Sure.
15   Q.   Okay. So --
16   A.   Before Lapetco.
17   Q.   Okay. So --
18   A.   No. Before the Clearinghouse.
19   Q.   Okay. So if you're confused on it, can you
20  see why I might not be able to get it straight?
21  Let's -- and I'm not fussing at you.
22   A.   Would you like to start again?
23   Q.   Listen, I'm not fussing at you. I'm just
24  trying to make sure I've got the complete list, okay?
25   A.   Sure. No problem.

Page 17

1    Q.   So --
2    A.   I worked for 24 Hour Fitness.
3    Q.   Let's just focus on oil and gas, if we can.
4    A.   Not a problem.
5    Q.   Okay. Oil and Gas; Swan Energy, Ferrari
6  Energy, Oil & Gas Asset Clearinghouse, Phoenix and now
7  Lapetco?
8    A.   After Oil & Gas Clearinghouse, back to Swan
9  Energy, then Lapetco.
10   Q.   Okay. Now I'm really lost. Swan Energy, what
11  years for your first gig?
12   A.   May of 2011, I believe.
13   Q.   For how long?
14   A.   Eight years or so.
15   Q.   So from May 2011 through 2019, you're at Swan
16  Energy?
17   A.   Correct.
18   Q.   Next?
19   A.   Ferrari Energy.
20   Q.   From when to when?
21   A.   Probably about a year, year and a half. I
22  don't recall the date.
23   Q.   Next?
24   A.   Oil & Gas Asset Clearinghouse. Same thing,
25  probably about a year and a half.

MAGNA ▶
LEGAL SERVICES

Page 18

1    Q.    Then Phoenix?
2    A.    No.
3    Q.    Okay.
4    A.    If you would like to start writing again, I'll
5    let you know.
6    Q.    Okay.
7    A.    After Ferrari Energy was Phoenix, then the Oil
8    & Gas Clearinghouse, then Swan, then Lapetco.
9    Q.    Okay.  So just to make sure I've got the
10   batting order straight, Swan?
11   A.    Uh-huh.
12   Q.    Then Ferrari?
13   A.    Yes.
14   Q.    Then Phoenix?
15   A.    Yes.
16   Q.    Then Oil & Gas Asset Clearinghouse?
17   A.    Yes.
18   Q.    And then back to Swan?
19   A.    Yes.
20   Q.    And now Lapetco?
21   A.    Yes.
22   Q.    When you say you were terminated from Ferrari
23   Energy, who, to your understanding, made the decision to
24   terminate you?
25   A.    The board that was in charge of the company.

Page 19

1    Q.    What was -- what was your job title at Ferrari
2    Energy?
3    A.    Landman.
4    Q.    What was Adam Ferrari's job title or role at
5    Ferrari Energy?
6    A.    I'm not sure what his title was.
7    Q.    Did you consider him to have been in a higher
8    level executive role?
9    A.    Yes.
10   Q.    Okay.  So a group of people are terminated
11   from Ferrari.  There's a lunch between you and three
12   others that you've named before where you basically have
13   discussions about going out and embarking upon a similar
14   concept to what you were doing at Ferrari Energy.  Fair
15   summary?
16   A.    Yes.
17   Q.    Okay.  Logistically, what happens next?
18   A.    How do you mean?
19   Q.    Well --
20   A.    Please explain.
21   Q.    How do we get from an idea discussion to an
22   entity coming into existence?
23   A.    Each person had one skill that they could
24   bring to the table.  Adam talked about looking for the
25   financial backing, which my understanding was from his

Page 20

1    family.
2    Q.    And so to your understanding, did Adam secure
3    from his family the initial capital contribution to what
4    ultimately became Phoenix?
5    A.    To my understanding, yes.
6    Q.    And you said, "We each had a specialty."  Kind
7    of take me through what each of the specialties of the
8    four of you were.  Yours sounds like was --
9    A.    Sales.
10   Q.    -- sales.
11   A.    Lindsey Wilson was an admin.  Adam Josephson
12   is a landman.  Adam is an engineer.
13   Q.    Adam Ferrari?
14   A.    Yes.
15   Q.    So we're going to have to get that straight,
16   because otherwise that will be confusing on the record,
17   okay?
18   A.    I didn't know we were talking about another
19   one, so sure.
20   Q.    Well, there's Adam Josephson and Adam Ferrari.
21   A.    Gotcha.
22   Q.    So I don't want to get confused between the
23   two.  Fair enough?
24   A.    Sure.
25   Q.    Okay.  So Lindsey was an admin, so what did --

Page 21

1    and was that ultimately her role at Phoenix was admin?
2    A.    Yes.
3    Q.    And what did Lindsey do at Phoenix as an
4    admin?
5    A.    Paperwork.
6    Q.    And just so -- admin, is that short for
7    administrative assistant basically?
8    A.    Yes.
9    Q.    There were legal documents that were put
10   together in terms of forming the LLC, correct?
11   A.    Yes.
12   Q.    Who was charged with getting those together
13   and overseeing the drafting of them and making sure they
14   were proper and looked in place?
15   A.    Adam and Lindsey, I believe.
16   Q.    So you and Adam Josephson were landmen.  Is
17   that in the oil and gas industry synonymous with being
18   sales guys?
19   A.    No.  Adam was more knowledgeable on land, like
20   mineral rights and deeds and land --
21   Q.    Okay.
22   A.    -- stuff.
23   Q.    And how were you distinct from Adam Josephson
24   in that regard then?
25   A.    I sold stuff.  I was the one who reached out



Christie Masone

April 07, 2025
Pages 22 to 25

Page 22

1  to purchase.
2      Q.  Was Adam Ferrari considered the brains behind
3  the operation?  And I don't mean that to be belittling
4  of anybody else, but was he sort of the mastermind, if
5  you will?
6          MR. SILLERS:  Object to form.
7      Q.  (BY MR. BAUM)  Adam Ferrari, that is.
8          MR. SILLERS:  Object to form.
9      A.  I would say he was the head engineer.
10     Q.  (BY MR. BAUM)  What did he do as head
11 engineer -- he being Adam Ferrari -- for Phoenix?
12     A.  He would be able to know areas to go and
13 purchase minerals and what their values would be.
14     Q.  In terms of executive decision making for
15 Phoenix, who was in charge of that?
16         MR. SILLERS:  Object to form.
17         MR. BAUM:  I'm sorry.  Basis?
18         MR. SILLERS:  I mean, executive decision
19 making can mean a whole bunch of different things, and
20 so I'm objecting to the form.
21     Q.  (BY MR. BAUM)  Was there a buck-stops-with
22 person at Phoenix?
23         MR. SILLERS:  Object to form.
24     A.  A joint decision.
25     Q.  (BY MR. BAUM)  Joint decision by whom?

Page 23

1      A.  The four people we mentioned.
2      Q.  Which would have included Adam Ferrari?
3      A.  Correct.
4      Q.  At the time that Phoenix was formed -- and was
5  it 2019 then that Phoenix was formed?  Sound about
6  right?
7      A.  That sounds about right.
8      Q.  At the time --
9      A.  Yes, sir.
10     Q.  -- that Phoenix was formed in 2019, who were
11 the initial members of the LLC, if you recall?
12     A.  Myself, Adam Ferrari, Lindsey Wilson, Adam
13 Josephson.
14     Q.  And what were the splits in terms of those
15 membership interests?
16     A.  I don't recall.
17     Q.  Were they equal or unequal?
18     A.  I don't recall.
19     Q.  Do you recall whether Adam Ferrari had a
20 greater ownership interest than you did?
21     A.  Yes.
22     Q.  Do you recall whether Adam Ferrari had the
23 majority ownership or membership interest in Ferrari at
24 the time that it was formed?
25     A.  At Ferrari when it was formed or when

Page 24

1  Phoenix --
2      Q.  Yes, sir.  No.  I'm sorry.  Let me -- I'm
3  sorry.  Good catch.  Let me ask it again.
4          At the time that Phoenix was formed in 2019,
5  did Adam Ferrari have a majority or controlling
6  ownership or membership interest in Phoenix?
7          MR. SILLERS:  Object to form.
8      A.  Yes.
9      Q.  (BY MR. BAUM)  Meaning greater than
10 51 percent?
11     A.  I believe so.
12     Q.  So as the member with the majority interest in
13 Phoenix, did Adam Ferrari then have the ultimate
14 decision making ability for Phoenix --
15         MR. SILLERS:  Object to form.
16     Q.  (BY MR. BAUM)  -- since he had --
17         MR. SILLERS:  Object to foundation.
18     Q.  (BY MR. BAUM)  -- the majority interest?
19     A.  On what?
20     Q.  On any matters for Phoenix.  And we can break
21 them down.
22         MR. SILLERS:  Object to form.
23     A.  No.
24     Q.  (BY MR. BAUM)  During the time that you were
25 at Phoenix, how many employees did Phoenix have?

Page 25

1      A.  I'm adding them up.  Sorry.  Maybe seven or
2  eight.
3      Q.  Who were the seven to eight employees that you
4  can recall?
5      A.  Myself, Adam Josephson, Adam Ferrari, Lindsey
6  Wilson, Chris -- which I do not recall his last name --
7  Curtis, Sean Goodnight and Tom Kruck.
8      Q.  How were you compensated as an employee of
9  Phoenix?
10     A.  Salary.
11     Q.  W-2?
12     A.  No.
13     Q.  How were you paid, if not as a W-2 employee?
14     A.  K-1.
15     Q.  How about Adam Josephson?  How was he
16 compensated?
17     A.  I do not know.
18     Q.  Lindsey, how was she compensated?
19     A.  I do not know.
20     Q.  Adam Ferrari, how was he compensated?
21     A.  I do not know.
22     Q.  Do you -- you don't know if he was paid a
23 salary or not?
24     A.  I do not.
25     Q.  Do you know if he was issued K-1s, he being



Christie Masone

April 07, 2025
Pages 26 to 29

Page 26

1 Adam Ferrari?
2    A. I do not.
3    Q. Who was the CPA for Phoenix during the time
4 that you were there?
5    A. I do not know.
6    Q. Who would know that?
7    A. I couldn't tell you.
8    Q. Do you still have your K-1s?
9    A. Yes.
10   Q. Who decided when and where Phoenix would
11 pursue mineral acquisitions?
12   A. Adam.
13   Q. Which Adam?
14   A. Adam Ferrari. Apologies.
15   Q. Who made the call on whether to pursue a deal
16 or walk away?
17   A. Adam Ferrari.
18   Q. Who decided how much to offer on any given
19 deal?
20   A. My understanding is that there was a software
21 that would dictate value.
22   Q. Who decided who would receive profits and
23 interest or equity in Phoenix?
24   A. Can you rephrase?
25   Q. Who decided who would receive either profits,

Page 27

1 interest or equity in Phoenix?
2        MR. SILLERS: Object to form.
3    A. Adam Ferrari.
4    Q. (BY MR. BAUM) Did Adam Ferrari decide on the
5 amounts of any equity distributions of Phoenix?
6    A. I do not recall.
7    Q. It certainly sounds like Mr. Ferrari had a
8 high-level role within Phoenix. Is that fair?
9    A. Sure.
10   Q. The equivalent of an executive role, fair?
11       MR. SILLERS: Object to form.
12   A. I would say each individual had an executive
13 role in what they were in charge of.
14   Q. (BY MR. BAUM) And that would include
15 Mr. Ferrari?
16   A. Correct.
17   Q. Who had check signing authority for Phoenix
18 during your time there?
19   A. I believe Lindsey Wilson.
20   Q. Did Mr. Ferrari have check signing authority?
21 Do you know?
22   A. I do not know.
23   Q. Who was in charge of pursuing capital raises
24 for Phoenix during the time that you were there?
25   A. Can you explain capital raises?

Page 28

1    Q. Well, did it ever -- so it sounds like there
2 was an initial -- some initial capital contributions
3 that were made when Phoenix was formed, right?
4    A. Yes.
5    Q. Was there ever after that -- those initial
6 capital contributions were made, was there ever any need
7 for additional capital to be raised for Phoenix?
8    A. Yes.
9    Q. And who was in charge of pursuing those
10 additional capital raises?
11   A. I would believe it was Adam and the -- and his
12 family.
13   Q. Sorry. Which Adam?
14   A. Adam Ferrari.
15   Q. And I'm not fussing at you.
16   A. It's okay, it's okay.
17   Q. I'm just -- I've just got to get it clear.
18   A. No. I did forget that there were two Adams in
19 this situation.
20   Q. We'll get it over time.
21   A. No problem. Hey, at least I'm not nodding. I
22 am saying yes.
23   Q. I know. Like I said, I'm not fussing.
24      So just to tick off the other employees, Tom
25 Kruck, who is he?

Page 29

1    A. He was another sales representative from
2 Ferrari Energy.
3    Q. Do you know how he was paid?
4    A. I do not.
5    Q. Do you know who decided on his rate of pay or
6 compensation?
7    A. I do not.
8    Q. It wasn't you?
9    A. No.
10   Q. So it could have been Adam Ferrari?
11       MR. SILLERS: Object to form.
12   A. Could have been.
13   Q. (BY MR. BAUM) I mean, they're limited --
14 we're down to four choices, and we know you weren't one
15 of the four, right?
16   A. Correct.
17   Q. You mentioned Sean. What's Sean's last name?
18   A. Goodnight.
19   Q. And what was his role?
20   A. Same as Tom Kruck. He was another sales
21 individual from Ferrari Energy.
22   Q. Curtis, last name again?
23   A. I don't recall his last name.
24   Q. Do you recall his role?
25   A. He was more of the, I guess, bookkeeper,



Christie Masone

April 07, 2025
Pages 30 to 33

Page 30

1 financial side of things.
2    Q.   Where did he reside?  Curtis Allen?
3    A.   Yes.
4    Q.   And I apologize if you -- was there another
5 Chris at the company?
6    A.   Yes.
7    Q.   And what was his last name?
8    A.   I don't recall his last name.
9    Q.   What was his role, if you recall?
10    A.   IT.
11    Q.   During your time at Phoenix, to the extent
12 signature was required on legal documents, who would
13 sign those documents?
14    A.   I do not know.
15    Q.   Given that Adam Ferrari had the majority
16 membership or ownership interest in Phoenix, from your
17 perspective, did he ever comport himself as if he had
18 any greater authority in terms of the operations of the
19 business than the rest of you?
20        MR. SILLERS:  Object to form.
21    A.   No.
22    Q.   (BY MR. BAUM)  In terms of key meetings for
23 the company for Phoenix, meaning key or important
24 strategic decisions needing to be made, would Adam
25 Ferrari have been in on all of those meetings, most

Page 31

1 likely?
2        MR. SILLERS:  Object to form.
3    A.   Yes.
4    Q.   (BY MR. BAUM)  Was Adam Ferrari vocal in terms
5 of strategic and operational decision making for
6 Phoenix?
7    A.   Can you expand?
8    Q.   I mean, he wasn't a mere bystander, I take it.
9 Fair?
10    A.   Nor were any of us.
11    Q.   Was there ever any discussion about keeping
12 Mr. Ferrari's name -- I'm sorry -- out of -- strike
13 that.  Let me rephrase it.
14        Was there ever any discussion around the
15 concept of keeping Mr. Ferrari's name out of Phoenix
16 documents and communications?
17    A.   No.  Woops, I shook my head on that one, but I
18 still said no.
19    Q.   Did you ever hear anyone, including
20 Mr. Ferrari, say that he did not want his name attached
21 to or associated with Phoenix?
22    A.   No.
23    Q.   You left Phoenix when?
24    A.   I can't recall the date.  Probably, like I
25 said, about a year and a half after I started there.

Page 32

1    Q.   What were the circumstances around your
2 leaving?
3    A.   I wanted to go to a more profitable position.
4    Q.   I don't mean this critically.  So it was over
5 money?
6    A.   Yes.
7    Q.   So you left voluntarily?
8    A.   Yes.
9    Q.   Was it amicable?
10    A.   Yeah.
11    Q.   Did you retain your ownership or membership
12 interest in Phoenix after you left?
13    A.   No.
14    Q.   Do you, as we sit here today, hold any type of
15 interest of any kind, even as an investor of Phoenix?
16    A.   No.
17    Q.   Do you receive any income or payments of any
18 kind from Phoenix?
19    A.   No.
20        (Exhibit 1 marked.)
21    Q.   (BY MR. BAUM)  Let me show you what I've
22 marked as Exhibit 1 to your deposition.  Take a minute
23 to look at that and let me know when you feel like
24 you've had time to look it over.
25    A.   Okay.

Page 33

1    Q.   Have you ever seen that e-mail exchange
2 before, the e-mail that I've marked as Exhibit 1 to your
3 deposition?
4    A.   I do not believe so, no.
5    Q.   And if you look at that -- let me back up.
6        Did Adam Ferrari ever have access to your
7 e-mail account at Phoenix?
8    A.   Not that I'm aware of.
9    Q.   Possible?
10    A.   Sure, yes.
11    Q.   And if we look at the second page of
12 Exhibit 1, do you see where at the bottom -- towards the
13 bottom, it says, "Sincerely, Daniel Glen"?
14    A.   Yes.
15    Q.   And below that, "Founding and Engineering
16 Manager," do you see that?
17    A.   Yes.
18    Q.   Was there a Daniel -- you listed off the
19 employees for me of Phoenix during the time that you
20 were there, and I don't recall you mentioning a Daniel
21 Glen.
22        Was there a Daniel Glen, to your recollection,
23 that was ever employed by Phoenix while you were there?
24    A.   No.
25    Q.   And do we see below Daniel Glen, it says,



Christie Masone                                                    April 07, 2025
                                                                  Pages 34 to 37

Page 34

1  "Founder." That's false?
2       MR. SILLERS: Object to form.
3       MR. BAUM: I'm sorry. Basis?
4       MR. SILLERS: That's not a question. You
5  just said, "That's false."
6       MR. BAUM: Yeah. That's false, question
7  mark?
8       MR. SILLERS: Is that false?
9       MR. BAUM: No. I can say that's false and
10  intonate at the end with a question mark. That makes it
11  a question.
12       MR. SILLERS: You didn't intonate, and
13  that's not a question, and that's why I objected. You
14  asked.
15       Q.  (BY MR. BAUM) Okay. There were only four
16  founders of Phoenix, correct? You listed them for me
17  earlier?
18       A.  Yes.
19       Q.  And Daniel Glen was not one of them?
20       A.  No.
21       Q.  So whoever wrote this e-mail, when they put
22  "Founder," that's false, isn't it?
23       A.  Yes.
24       Q.  And you didn't write this e-mail?
25       A.  No.

Page 35

1       Q.  Possible that Adam Ferrari wrote it?
2       A.  Yes.
3       Q.  During the time that you were at Phoenix, did
4  Phoenix ever engage in any sort of fraudulent or
5  unethical conduct?
6       A.  No.
7       MR. SILLERS: Object to form.
8       Q.  (BY MR. BAUM) Did you believe that Phoenix
9  was a good, ethical, reputable outfit?
10       A.  Yes.
11       Q.  Made money for its investors?
12       A.  You would have to define investor.
13       Q.  Let me ask it this way. Were there any
14  investors of Phoenix other than the four founders and
15  Lion of Judah?
16       THE REPORTER: I didn't hear you.
17       MR. BAUM: Lion of Judah.
18       A.  I'm still confused on the term investor.
19       Q.  (BY MR. BAUM) Those who put money into the
20  company.
21       A.  I don't know whom those would be.
22       Q.  Did you make money -- did you make any sort of
23  an investment or capital contribution into Phoenix?
24       A.  No.
25       Q.  Do you know if those who did make capital

Page 36

1  contributions into Phoenix saw any return of their
2  capital?
3       A.  I do not know that.
4       Q.  I should have asked it that way.
5       Did you believe that Phoenix was successful in
6  its oil and gas endeavors?
7       A.  Yes.
8       Q.  So if, hypothetically, someone had been
9  running around town saying you were the CEO of Phoenix,
10  although that might not be true, it certainly wouldn't
11  be a tarnish on your image. Agreed?
12       A.  No, it wouldn't be.
13       MR. BAUM: Let's take a quick break.
14       (Break taken from 10:56 to 11:07.)
15       Q.  (BY MR. BAUM) Mr. Masone, when Phoenix was
16  first formed or during the time that you were at
17  Phoenix, did it have any physical offices?
18       A.  No.
19       Q.  A P.O. box?
20       A.  I do not know. I worked from home.
21       Q.  Were there any in-person meetings of the
22  company?
23       A.  No.
24       Q.  Okay. To your knowledge, was Adam Ferrari
25  ever on the website of Phoenix?

Page 37

1       A.  I do not recall.
2       Q.  In terms of your sales efforts as a landman
3  for Phoenix, did you ever discuss Adam Ferrari's role at
4  the company?
5       A.  No.
6       Q.  Did you ever become aware of any allegations
7  of criminal conduct by Mr. Ferrari in the state of
8  Colorado?
9       A.  Yes.
10       Q.  How did you -- let me ask it this way. When
11  did you first become aware of those allegations?
12       A.  While I was working at Ferrari Energy.
13       Q.  And what was the context of you becoming aware
14  of those allegations?
15       A.  It was in the Greeley Tribune.
16       Q.  Are you aware of whether Mr. Ferrari ever pled
17  guilty to any allegations of criminal conduct?
18       A.  I am not.
19       Q.  And so what year would that have been that you
20  became aware of the allegations of criminal conduct
21  against Mr. Ferrari in Colorado?
22       A.  Same year that I left there, which was -- I
23  believe you had '19.
24       Q.  In your role as a landman or in your sales
25  efforts for Phoenix, did you ever run into folks who



Christie Masone

April 07, 2025
Pages 38 to 41

Page 38

1 expressed to you that they knew about the allegations of
2 criminal conduct against Mr. Ferrari?
3    A.  No.
4    Q.  During the time that you were with Phoenix,
5 did anyone ever express to you that they were unwilling
6 to do business with Phoenix because of any allegations
7 of criminal misconduct by Mr. Ferrari?
8    A.  No.
9    Q.  So I want to see if I can briefly summarize
10 some of the things that you told me about Mr. Ferrari's
11 involvement with Phoenix, okay?
12    A.  Okay.
13    Q.  He decided when and where Ferrari [sic] would
14 make acquisitions, true?
15    A.  Phoenix?
16    Q.  I'm sorry.  Yes.  Adam Ferrari decided when
17 and where Phoenix would make acquisitions, true?
18    A.  Yes.
19    Q.  He decided whether deals were on or off, true?
20       MR. SILLERS:  Object to form.
21    A.  Yes.
22    Q.  (BY MR. BAUM)  He decided equity
23 distributions, true?
24       MR. SILLERS:  Object to form; misstates
25  prior testimony.

Page 39

1    A.  I don't know that.
2    Q.  (BY MR. BAUM)  Okay.  He made decisions or
3 efforts in terms of financial backing for the company,
4 true?
5    A.  True.
6    Q.  He was a guiding force in terms of strategic
7 decision making for the company, true?
8       MR. SILLERS:  Object to form.
9    A.  True.
10    Q.  (BY MR. BAUM)  He was a guiding force in terms
11 of operational decision making for the company, true?
12    A.  Yes, true.
13    Q.  He certainly then, it sounds like, had more
14 than a pure advisory role with the company.  Fair
15 statement?
16    A.  Yes.
17       MR. BAUM:  Pass the witness.
18       MR. SILLERS:  Should I sit over there, or
19 do you want me to --
20       THE REPORTER:  I'm fine either way.
21       MR. SILLERS:  Let me sit here.
22       MR. BAUM:  I'm happy to switch with you,
23 if you want.
24       MR. SILLERS:  I just like to look at the
25 person I'm speaking to.

Page 40

1       THE WITNESS:  I'll face that way.
2       MR. SILLERS:  Hi, Mr. Masone.
3       THE WITNESS:  Hi.
4          E X A M I N A T I O N
5 BY MR. SILLERS:
6    Q.  I'm David Sillers.  I represent Adam Ferrari.
7       We've never met, correct?
8    A.  Correct.
9    Q.  The counsel a few minutes ago asked you
10 questions about the Phoenix LLC agreement.  Do you
11 recall that?
12    A.  Yes.
13    Q.  Do you recall he asked you questions about the
14 ownership of Phoenix when it was created?
15    A.  Yes.
16    Q.  And I think you testified that you thought
17 that Mr. Ferrari owned a portion of Phoenix.  Do you
18 recall doing that?
19    A.  Yes.
20    Q.  The LLC agreement would control who owns the
21 actual ownership interest in the company, right?
22       MR. BAUM:  Object to form.
23    A.  If you say so.
24    Q.  (BY MR. SILLERS)  No.  I'm asking you.  Like
25 when you have a company and it has ownership interests,

Page 41

1 it's controlled by a document, right, the LLC agreement?
2       MR. BAUM:  Object to form.
3    A.  Correct.
4    Q.  (BY MR. SILLERS)  And have you seen -- when is
5 the last time you looked at that LLC agreement?
6    A.  The day I signed it.
7    Q.  Counsel didn't show you the LLC agreement when
8 we were sitting here, did he?
9    A.  No.
10    Q.  No.  And if that agreement in fact had Lion of
11 Judah Capital as an owner and not Adam Ferrari, would
12 that refresh your recollection about who actually owned
13 Phoenix Energy?
14       MR. BAUM:  Object to form.
15    A.  Yes.
16    Q.  (BY MR. SILLERS)  Can you explain that?
17    A.  It would list the individuals that I -- that I
18 would see on there.
19    Q.  Right.  So it's not -- so this was six years
20 ago, right, that you signed this LLC agreement, right?
21       MR. BAUM:  Form.
22    A.  It -- yes.
23    Q.  (BY MR. SILLERS)  2019?
24    A.  It's been a while, yes.
25    Q.  Yeah.  And so you don't necessarily remember



Christie Masone

April 07, 2025
Pages 42 to 45

Page 42

1  exactly who the equity owners are.
2          MR. BAUM:  Form.
3      Q.  (BY MR. SILLERS)  Is that fair?
4          MR. BAUM:  Form.
5      A.  That is fair, other than who I listed.
6      Q.  (BY MR. SILLERS)  Okay.
7      A.  Yes.
8      Q.  So I'm just trying to understand.  So if there
9  is a document -- there is an LLC agreement that you
10  testified that you signed, right?
11      A.  Yes.
12      Q.  You haven't seen it in six years?
13      A.  Correct.
14      Q.  To the best of your recollection, Adam Ferrari
15  was one of the owners of that agreement, correct?
16      A.  Yes.
17      Q.  But if you looked at that LLC agreement and
18  saw that in fact it was a company called Lion of Judah
19  Capital, that would -- and Adam Ferrari is not an owner,
20  that would trump your recollection.  Fair enough?
21          MR. BAUM:  Object to form.
22      A.  Correct.
23      Q.  (BY MR. SILLERS)  You said that Adam Ferrari
24  helped raise capital for Phoenix as it was being formed.
25  Is that correct?

Page 43

1      A.  Yes.
2      Q.  And you remember that it was his parents who
3  provided at least some of the capital for that
4  formation.  Do you recall?
5      A.  Yes.
6      Q.  And what amount of capital as compared to the
7  entire amount of capital, if you recall, did
8  Mr. Ferrari's parents provide?
9      A.  I do not know.
10      Q.  Okay.  Do you know if they had an ownership
11  interest in Phoenix?
12      A.  I do not know that.
13      Q.  Okay.  What do you know about William Francis?
14      A.  Nothing.
15      Q.  Have you ever heard Mr. Francis's name before
16  today?
17      A.  When I got a subpoena with his name on it.
18      Q.  Right.  When you were at Phoenix the whole
19  time or Ferrari Energy before that, did you ever hear of
20  Mr. Francis?
21      A.  No.
22      Q.  And have you ever heard of a dispute between
23  Mr. Francis and Mr. Ferrari, other than the subpoena and
24  what we've talked about today?
25      A.  No.

Page 44

1      Q.  You were shown a document that was marked as
2  Exhibit 1 to your deposition.  Do you recall that?
3      A.  Yes.
4      Q.  Do you recall whether this was sent during
5  your time at Phoenix Energy?  The date is August 29th,
6  2019.
7          MR. BAUM:  Object to form.
8      A.  I don't recall the exact dates that I was
9  there.
10      Q.  (BY MR. SILLERS)  Okay.  So --
11      A.  I can't give you an affirmative answer.
12      Q.  That's fair.  What I'm trying to ask you is,
13  was this sent after you left Phoenix Energy or not?
14      A.  I don't know.
15      Q.  And you testified, I believe, that you don't
16  remember ever seeing this e-mail before.  Is that right?
17      A.  Correct.
18      Q.  Okay.  You don't know -- do you know who
19  Daniel Glen is?
20      A.  No.
21          MR. SILLERS:  That's all I have.
22          F U R T H E R   E X A M I N A T I O N
23  BY MR. BAUM:
24      Q.  As you testified earlier, then and now, your
25  understanding -- your recollection is that Adam Ferrari

Page 45

1  was an owner of Phoenix, correct?
2      A.  Correct.
3      Q.  Whether direct or indirect, correct?
4      A.  Correct.
5      Q.  And that he was an owner would be consistent
6  with your interaction with him during your time at
7  Phoenix.  Fair?
8          MR. SILLERS:  Object to form.
9      A.  Fair.
10      Q.  (BY MR. BAUM)  He acted like an owner, right?
11      A.  Well, as I had stated before, so did everyone.
12      Q.  Right.  Including Adam Ferrari?
13      A.  Correct.
14          MR. BAUM:  Pass the witness.
15          MR. SILLERS:  We're done.
16          THE REPORTER:  Do you want a copy of the
17  transcript?
18          MR. SILLERS:  Yes, please.
19          THE REPORTER:  Okay.  Did you want a copy
20  of the transcript?
21          MS. NAUDIN:  Sure.
22          (End of proceedings at 11:18 a.m.)
23
24
25



Christie Masone

April 07, 2025
Pages 46 to 48

## Page 46

1      CHANGES AND SIGNATURE
2  WITNESS NAME:  CHRISTIE "CHRIS" VINCENT MASONE
3  DATE OF DEPOSITION:  4/7/2025
4  PAGE    LINE    CHANGE        REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15      I, CHRISTIE "CHRIS" VINCENT MASONE, have
   read the foregoing deposition and hereby affix my
16 signature that same is true and correct, except as noted
   above.
17
18      _____
        CHRISTIE "CHRIS" VINCENT MASONE
19      CA# 3:23-cv-00455-S
20 THE STATE OF _____ )
   THE COUNTY OF _____ )
21
        Subscribed and sworn to before me by the said
22 witness, CHRISTIE "CHRIS" VINCENT MASONE, on this the
   _____ day of _____, 2025.
23
        _____
24      NOTARY PUBLIC IN AND FOR
        THE STATE OF _____
25      COMMISSION EXPIRES:  _____

## Page 47

1  STATE OF TEXAS  )
2      I, Kristel L. Wilkins, a Certified Shorthand
3  Reporter in and for the State of Texas, do hereby
4  certify that, pursuant to the agreements hereinbefore
5  set forth, there came before me on the 7th day of April,
6  A.D., 2025, at 10:03 a.m., at the offices of Brown Fox,
7  located at 8111 Preston Road, Suite 300, in the City of
8  Dallas, State of Texas, the following named person, to
9  wit:  CHRISTIE "CHRIS" VINCENT MASONE, who was by me
10 duly cautioned and sworn to testify the truth, the whole
11 truth and nothing but the truth of his knowledge
12 touching and concerning the matter in controversy in
13 this cause; and that he was thereupon carefully examined
14 upon his oath and his examination reduced to writing
15 under my supervision; that the deposition is a true
16 record of the testimony given by the witness, same to be
17 sworn to and subscribed by said witness before any
18 Notary Public, pursuant to the agreement of the parties;
19 and that the amount of time used by each party at the
20 deposition is as follows:
21 MR. BAUM.....55 MINUTES
22 MR. DEBTER.....00 HOURS:00 MINUTES
23 MR. SILLERS.....4 MINUTES
24 MR. GOOD.....00 HOURS:00 MINUTES
25 MS. NAUDIN.....00 HOURS:00 MINUTES

## Page 48

1      I further certify that I am neither attorney
2  nor counsel for, nor related to or employed by, any of
3  the parties to the action in which this deposition is
4  taken, and further that I am not a relative or employee
5  of any attorney or counsel employed by the parties
6  hereto, or financially interested in the action.
7      I further certify that before the completion of
8  the deposition, Counsel for Deponent did request to
9  review the transcript.
10      In witness whereof, I have hereunto set my hand
11 and affixed my seal this 8th day of April, A.D., 2025.
12
13
14      _____
        Kristel L. Wilkins, Texas CSR 7000
15      Expiration Date:  1-31-2026
        Magna Legal Services
16      Firm Registration No. 633
        16414 San Pedro Avenue, Suite 900
17      San Antonio, Texas 78232
        (888) 624-6221
18
19
20
21
22
23
24
25



Christie Masone

April 07, 2025
Index: 1..box

**1**

**1** 32:20,22 33:2,12 44:2

**10:04** 5:13

**10:08** 5:13

**10:56** 36:14

**11:07** 36:14

**11:18** 45:22

**14** 14:11

**19** 37:23

**2**

**2001** 9:20

**2011** 17:12,15

**2019** 17:15 23:5,10 24:4 41:23 44:6

**24** 10:6 17:2

**29th** 44:5

**3**

**340** 7:16

**5**

**51** 24:10

**7**

**75078** 7:18

**8**

**8/13/79** 7:20

**9**

**97** 9:12

**A**

**a.m.** 45:22

**ability** 24:14

**Academy** 9:8

**access** 33:6

**accommodate** 7:11

**account** 33:7

**acquisitions** 26:11 38:14,17

**acted** 45:10

**actual** 40:21

**Adam** 6:6 12:1 13:15,18,21 14:2,7,
25 19:4,24 20:2,11,12,13,20 21:15,
16,19,23 22:2,7,11 23:2,12,19,22
24:5,13 25:5,15,20 26:1,12,13,14,17
27:3,4 28:11,13,14 29:10 30:15,24
31:4 33:6 35:1 36:24 37:3 38:16
40:6 41:11 42:14,19,23 44:25 45:12

**Adams** 28:18

**adding** 25:1

**additional** 28:7,10

**address** 7:15

**admin** 20:11,25 21:1,4,6

**administered** 6:9

**administrative** 21:7

**advisory** 39:14

**affirmative** 44:11

**Agreed** 36:11

**agreement** 40:10,20 41:1,5,7,10,20
42:9,15,17

**agreements** 5:4,16

**ahead** 10:8

**allegations** 37:6,11,14,17,20 38:1,6

**Allen** 30:2

**amicable** 32:9

**amount** 43:6,7

**amounts** 27:5

**answers** 6:20,23 7:1

**anymore** 8:15

**anytime** 7:10

**Apologies** 26:14

**apologize** 30:4

**appearing** 13:23

**areas** 22:12

**Asset** 10:9,19 16:3 17:6,24 18:16

**assistant** 21:7

**Assurity** 10:6

**attached** 31:20

**attend** 9:13

**attorney** 6:4 12:11 13:7

**attorneys** 10:22 11:3 13:16,21 14:2

**attorneys'** 13:19

**August** 44:5

**authority** 27:17,20 30:18

**aware** 11:10,17 33:8 37:6,11,13,16,
20

**B**

**BA** 9:23,24

**back** 16:6 17:8 18:18 33:5

**backing** 19:25 39:3

**basically** 19:12 21:7

**Basis** 22:17 34:3

**batting** 18:10

**BAUM** 5:7,12,19,25 22:7,10,17,21,
25 24:9,16,18,24 27:4,14 29:13
30:22 31:4 32:21 34:3,6,9,15 35:8,
17,19 36:13,15 38:22 39:2,10,17,22
40:22 41:2,14,21 42:2,4,21 44:7,23
45:10,14

**begin** 6:20

**belittling** 22:3

**birth** 7:19

**board** 18:25

**bookkeeper** 29:25

**boss** 11:5 13:25

**bottom** 33:12,13

**Boulder** 9:16

**box** 36:19



**brains** 22:2

**break** 5:13 7:10 24:20 36:13,14

**briefly** 38:9

**bring** 19:24

**Brothers** 9:8

**BS** 9:23

**buck-stops-with** 22:21

**bunch** 22:19

**business** 8:2 15:10 30:19 38:6

**bystander** 31:8

---

**C**

**call** 12:5,6,19,21,25 13:9,11 26:15

**called** 42:18

**capital** 11:24 20:3 27:23,25 28:2,6, 7,10 35:23,25 36:2 41:11 42:19,24 43:3,6,7

**captured** 15:24

**Carolina** 8:20

**catch** 24:3

**cautioned** 5:21

**cell** 13:13

**CEO** 36:9

**cetera** 15:11

**chance** 7:6

**charge** 18:25 22:15 27:13,23 28:9

**charged** 21:12

**check** 27:17,20

**Cherry** 15:3,5

**choices** 29:14

**Chris** 5:20 25:6 30:5

**Christian** 9:8

**Christie** 5:20 6:3

**circumstances** 32:1

**City** 8:12

**clear** 6:18 11:22 12:23 14:24 28:17

**Clearinghouse** 10:9,19 16:4,18 17:6,8,24 18:8,16

**co-counsel** 5:6

**code** 7:17

**college** 9:13 10:3 15:20

**Colorado** 9:16 15:5 37:8,21

**communications** 31:16

**companies** 8:14

**company** 8:3 14:20 15:11,12 18:25 30:5,23 35:20 36:22 37:4 39:3,7,11, 14 40:21,25 42:18

**compared** 43:6

**compensated** 25:8,16,18,20

**compensation** 29:6

**complete** 16:24

**comport** 30:17

**concept** 19:14 31:15

**conduct** 35:5 37:7,17,20 38:2

**confused** 16:19 20:22 35:18

**confusing** 20:16

**connection** 8:6

**considered** 22:2

**consistent** 45:5

**contest** 7:8

**context** 37:13

**continue** 6:25

**contribution** 20:3 35:23

**contributions** 28:2,6 36:1

**control** 40:20

**controlled** 41:1

**controlling** 24:5

**conversation** 6:15

**copy** 45:16,19

**correct** 16:5 17:17 21:10 23:3 27:16 29:16 34:16 40:7,8 41:3 42:13,15, 22,25 44:17 45:1,2,3,4,13

**counsel** 5:3 40:9 41:7

**county** 8:10

**court** 6:8,18,23 8:21,22

**courthouse** 6:11

**CPA** 26:3

**created** 40:14

**Creek** 15:5

**Cricket** 15:3,5

**criminal** 37:7,17,20 38:2,7

**critically** 32:4

**Curtis** 25:7 29:22 30:2

---

**D**

**Daniel** 33:13,18,20,22,25 34:19 44:19

**Darian** 7:16

**date** 7:19 17:22 31:24 44:5

**dates** 44:8

**David** 40:6

**day** 12:22 41:6

**deal** 26:15,19

**deals** 38:19

**decide** 27:4

**decided** 26:10,18,22,25 29:5 38:13, 16,19,22

**decision** 18:23 22:14,18,24,25 24:14 31:5 39:7,11

**decisions** 30:24 39:2

**deeds** 21:20

**define** 35:12

**degree** 9:21

**deposition** 7:21 8:1 10:23 11:4 13:8,24 32:22 33:3 44:2

**depositions** 5:18

**dictate** 26:21

**difference** 16:8

**direct** 45:3

**discuss** 37:3

**discussed** 15:9



**discussion** 15:7 19:21 31:11,14

**discussions** 19:13

**dispute** 43:22

**distinct** 21:23

**distributions** 27:5 38:23

**document** 41:1 42:9 44:1

**documents** 10:25 11:20 21:9 30:12,13 31:16

**drafting** 21:13

**Drive** 7:16

**duly** 5:21

---

**E**

**e-mail** 33:1,2,7 34:21,24 44:16

**e-mails** 11:20

**earlier** 34:17 44:24

**education** 9:25

**effect** 6:11

**efforts** 37:2,25 39:3

**embarking** 19:13

**employed** 33:23

**employee** 25:8,13

**employees** 24:25 25:3 28:24 33:19

**end** 34:10 45:22

**endeavors** 36:6

**endurance** 7:8

**Energy** 8:5,7,15 10:7,15,18 14:9 15:13,17,21 16:3,4,9 17:5,6,9,10,16, 19 18:7,23 19:2,5,14 29:2,21 37:12 41:13 43:19 44:5,13

**engage** 35:4

**engineer** 20:12 22:9,11

**Engineering** 33:15

**entire** 43:7

**entity** 19:22

**equal** 23:17

**equity** 26:23 27:1,5 38:22 42:1

**equivalent** 27:10

**ethical** 35:9

**Ethnic** 9:22

**everyday** 6:14

**exact** 44:8

**exchange** 33:1

**executive** 19:8 22:14,18 27:10,12

**exhibit** 32:20,22 33:2,12 44:2

**exist** 8:15

**existence** 19:22

**expand** 31:7

**experience** 15:20 16:2

**explain** 19:20 27:25 41:16

**express** 38:5

**expressed** 38:1

**extent** 30:11

---

**F**

**face** 40:1

**fact** 11:3 13:23 41:10 42:18

**fair** 5:19 19:14 20:23 27:8,10 31:9 39:14 42:3,5,20 44:12 45:7,9

**false** 34:1,5,6,8,9,22

**family** 20:1,3 28:12

**federal** 8:21

**feel** 7:9 32:23

**fees** 13:19

**Ferrari** 6:6 11:11 12:1 13:15,18,22 14:2,7,9,25 15:13,17,21 16:4,9 17:5, 19 18:7,12,22 19:1,5,11,14 20:13,20 22:2,7,11 23:2,12,19,22,23,25 24:5, 13 25:5,20 26:1,14,17 27:3,4,7,15, 20 28:14 29:2,10,21 30:15,25 31:4, 20 33:6 35:1 36:24 37:7,12,16,21 38:2,7,13,16 40:6,17 41:11 42:14, 19,23 43:19,23 44:25 45:12

**Ferrari's** 19:4 31:12,15 37:3 38:10 43:8

**filed** 6:5 8:8

**financial** 10:6 19:25 30:1 39:3

**find** 13:16 14:15

**fine** 39:20

**finish** 6:19

**firm** 11:6

**Fitness** 10:6 17:2

**focus** 17:3

**folks** 37:25

**force** 6:10 39:6,10

**forget** 28:18

**form** 15:10 22:6,8,16,20,23 24:7,15, 22 27:2,11 29:11 30:20 31:2 34:2 35:7 38:20,24 39:8 40:22 41:2,14,21 42:2,4,21 44:7 45:8

**formation** 43:4

**formed** 23:4,5,10,24,25 24:4 28:3 36:16 42:24

**forming** 21:10

**foundation** 24:17

**Founder** 34:1,22

**founders** 14:4,6 34:16 35:14

**Founding** 33:15

**Francis** 6:5 11:11 43:13,20,23

**Francis's** 43:15

**fraudulent** 35:4

**full** 6:1 16:7,8

**fully** 14:16

**funding** 13:18

**fussing** 15:19 16:21,23 28:15,23

---

**G**

**gas** 10:9,18 16:3 17:3,5,6,8,24 18:8, 16 21:17 36:6

**gas/energy** 10:16

**General** 10:6

**genesis** 14:13

**gig** 17:11

**give** 6:10,25 16:6 44:11



Christie Masone

April 07, 2025
Index: giving..LLC

**giving**  6:22 11:3

**Glen**  33:13,21,22,25 34:19 44:19

**good**  5:14 24:3 35:9

**Goodnight**  25:7 29:18

**Gotcha**  20:21

**graduate**  9:9,17

**graduated**  10:3

**great**  6:22

**greater**  23:20 24:9 30:18

**Greeley**  37:15

**ground**  6:13

**group**  11:24 19:10

**guess**  29:25

**guiding**  39:6,10

**guilty**  37:17

**guys**  21:18

### H

**half**  17:21,25 31:25

**handed**  11:12 12:4,22

**happy**  7:11 39:22

**hard**  6:17

**head**  6:24 22:9,10 31:17

**hear**  31:19 35:16 43:19

**heard**  43:15,22

**helped**  42:24

**helping**  13:16

**Hey**  28:21

**high**  9:3,7,13

**high-level**  27:8

**higher**  19:7

**hold**  32:14

**Holdings**  11:24

**home**  36:20

**Hour**  10:6 17:2

**Houston**  8:17

**huh-uhs**  6:23

**hypothetically**  36:8

### I

**idea**  14:19 19:21

**ideas**  15:9

**image**  36:11

**important**  30:23

**Importantly**  7:3

**in-person**  36:21

**include**  27:14

**included**  23:2

**including**  31:19 45:12

**income**  32:17

**indirect**  45:3

**individual**  27:12 29:21

**individuals**  14:14 15:15 41:17

**industry**  16:3 21:17

**initial**  20:3 23:11 28:2,5

**interaction**  45:6

**interest**  23:20,23 24:6,12,18 26:23
   27:1 30:16 32:12,15 40:21 43:11

**interests**  23:15 40:25

**intonate**  34:10,12

**investment**  35:23

**investor**  32:15 35:12,18

**investors**  35:11,14

**involvement**  13:15 38:11

**issued**  25:25

### J

**Jersey**  9:6

**job**  6:22 10:15 19:1,4

**joined**  5:14

**joint**  22:24,25

**Josephson**  14:7,25 20:11,20 21:16,
   23 23:13 25:5,15

**Judah**  35:15,17 41:11 42:18

### K

**K-1**  25:14

**K-1S**  25:25 26:8

**keeping**  31:11,15

**key**  30:22,23

**kind**  20:6 32:15,18

**knew**  38:1

**knowledge**  36:24

**knowledgeable**  21:19

**Kruck**  25:7 28:25 29:20

### L

**L-A-P-E-T-C-O**  10:14

**land**  21:19,20

**landman**  19:3 20:12 37:2,24

**landmen**  21:16

**Lapetco**  10:10,12,19 16:4,16 17:7,9
   18:8,20

**lawsuit**  6:5 8:4,6,8 11:10,17 12:15
   13:23

**leaving**  32:2

**left**  31:23 32:7,12 37:22 44:13

**legal**  21:9 30:12

**level**  19:8

**limited**  29:13

**Lindsey**  14:7,24,25 20:11,25 21:3,
   15 23:12 25:5,18 27:19

**Lion**  35:15,17 41:10 42:18

**list**  15:20,25 16:10,24 41:17

**listed**  33:18 34:16 42:5

**Listen**  16:23

**listing**  15:21

**live**  8:19

**LLC**  11:24 21:10 23:11 40:10,20
   41:1,5,7,20 42:9,17



**located** 8:14,16
**Logistically** 19:17
**long** 7:9 13:11 17:13
**looked** 21:14 41:5 42:17
**lost** 17:10
**lot** 6:14
**lunch** 14:19,21,22 15:2,6 19:11

**M**

**made** 18:23 26:15 28:3,6 30:24
  35:11 39:2
**majority** 23:23 24:5,12,18 30:15
**make** 6:13,17 11:22 15:24 16:24
  18:9 35:22,25 38:14,17
**makes** 34:10
**making** 21:13 22:14,19 24:14 31:5
  39:7,11
**Manager** 33:16
**mark** 34:7,10
**marked** 32:20,22 33:2 44:1
**Masone** 5:20 6:3,4 36:15 40:2
**mastermind** 22:4
**matters** 24:20
**meaning** 24:9 30:23
**meeting** 10:22
**meetings** 30:22,25 36:21
**member** 24:12
**members** 23:11
**membership** 23:15,23 24:6 30:16
  32:11
**mentioned** 23:1 29:17
**mentioning** 33:20
**mere** 31:8
**met** 40:7
**mineral** 15:16 21:20 26:11
**minerals** 22:13
**minute** 13:12 32:22

**minutes** 40:9
**misconduct** 38:7
**misstates** 38:24
**money** 32:5 35:11,19,22
**monkey** 5:9

**N**

**named** 14:23 19:12
**NAUDIN** 45:21
**necessarily** 41:25
**needing** 30:24
**nodding** 6:24 28:21
**North** 8:20

**O**

**oath** 5:23 6:9
**Object** 22:6,8,16,23 24:7,15,17,22
  27:2,11 29:11 30:20 31:2 34:2 35:7
  38:20,24 39:8 40:22 41:2,14 42:21
  44:7 45:8
**objected** 34:13
**objecting** 22:20
**occasioned** 8:1
**occur** 12:21
**offer** 26:18
**offices** 36:17
**oil** 10:9,15,18 16:2,3 17:3,5,6,8,24
  18:7,16 21:17 36:6
**operation** 22:3
**operational** 31:5 39:11
**operations** 30:18
**order** 16:5,7 18:10
**Originally** 8:25
**outfit** 35:9
**overseeing** 21:13
**owned** 40:17 41:12
**owner** 41:11 42:19 45:1,5,10

**owners** 42:1,15
**ownership** 23:20,23 24:6 30:16
  32:11 40:14,21,25 43:10
**owns** 40:20

**P**

**P.O.** 36:19
**Padula** 8:5,18
**paid** 25:13,22 29:3
**Paperwork** 21:5
**parents** 43:2,8
**part** 14:13
**parties** 8:4
**Pass** 39:17 45:14
**pay** 29:5
**payments** 32:17
**people** 14:11 19:10 23:1
**percent** 24:10
**person** 19:23 22:22 39:25
**perspective** 30:17
**Phoenix** 11:20,23,24 14:4,8,13,17
  16:10 17:6 18:1,7,14 20:4 21:1,3
  22:11,15,22 23:4,5,10 24:1,4,6,13,
  14,20,25 25:9 26:3,10,23 27:1,5,8,
  17,24 28:3,7 30:11,16,23 31:6,15,
  21,23 32:12,15,18 33:7,19,23 34:16
  35:3,4,8,14,23 36:1,5,9,15,17,25
  37:3,25 38:4,6,11,15,17 40:10,14,17
  41:13 42:24 43:11,18 44:5,13 45:1,7
**phone** 13:13
**physical** 36:17
**place** 21:14
**pled** 37:16
**portion** 40:17
**position** 32:3
**postgraduate** 9:25
**previous** 8:2
**prior** 11:9,16 38:25
**problem** 16:1,25 17:4 28:21



Christie Masone

April 07, 2025
Index: proceeding..specialties

**proceeding**  8:22

**proceedings**  45:22

**professionally**  10:2

**profitable**  32:3

**profits**  26:22,25

**proper**  21:14

**Prosper**  7:14

**provide**  43:8

**provided**  43:3

**purchase**  22:1,13

**purchasing**  15:15

**pure**  39:14

**pursue**  26:11,15

**pursuing**  27:23 28:9

**put**  21:9 34:21 35:19

---

**Q**

**question**  6:16,20 7:3 34:4,6,10,11,
13

**questions**  40:10,13

**quick**  36:13

---

**R**

**raise**  42:24

**raised**  28:7

**raises**  27:23,25 28:10

**rate**  29:5

**Reach**  15:15

**reached**  21:25

**Reaching**  14:14

**ready**  10:23

**recall**  12:24 13:5 15:21 17:22 23:11,
16,18,19,22 25:4,6 27:6 29:23,24
30:8,9 31:24 33:20 37:1 40:11,13,18
43:4,7 44:2,4,8

**receipt**  11:9

**receive**  26:22,25 32:17

**received**  11:6 12:10

**recollection**  33:22 41:12 42:14,20
44:25

**record**  5:4,16 6:2,18 20:16

**refresh**  41:12

**regard**  21:24

**remember**  41:25 43:2 44:16

**rephrase**  7:6 26:24 31:13

**reply**  13:4

**reporter**  5:3,8,11,15 6:8,18,23
35:16 39:20 45:16,19

**represent**  40:6

**representative**  8:7 29:1

**representing**  6:5 14:2

**reputable**  35:9

**required**  11:16 30:12

**reside**  7:13 8:19 30:2

**rest**  5:18 30:19

**retain**  13:16 32:11

**retained**  11:19

**return**  36:1

**review**  10:25

**rights**  15:16 21:20

**Robert**  8:5,18

**role**  13:15 15:17 19:4,8 21:1 27:8,
10,13 29:19,24 30:9 37:3,24 39:14

**roles**  10:20

**rules**  6:13

**run**  6:13 37:25

**running**  36:9

---

**S**

**salary**  25:10,23

**sale-related**  10:20

**sales**  8:7 10:4 20:9,10 21:18 29:1,20
37:2,24

**salesman**  15:18

**school**  9:3,7,13

**Sean**  25:7 29:17

**Sean's**  29:17

**sector**  10:16

**secure**  20:2

**share**  12:23

**shook**  31:17

**short**  21:6

**show**  32:21 41:7

**shown**  44:1

**sic**  38:13

**side**  30:1

**sign**  30:13

**signature**  30:12

**signed**  41:6,20 42:10

**signing**  27:17,20

**Sillers**  5:5,9,17 22:6,8,16,18,23
24:7,15,17,22 27:2,11 29:11 30:20
31:2 34:2,4,8,12 35:7 38:20,24 39:8,
18,21,24 40:2,5,6,24 41:4,16,23
42:3,6,23 44:10,21 45:8,15,18

**similar**  19:13

**Sincerely**  33:13

**sir**  7:15 23:9 24:2

**sit**  32:14 39:18,21

**sitting**  41:8

**situation**  28:19

**skill**  19:23

**slate**  16:7,8

**smoother**  6:14

**software**  26:20

**sold**  21:25

**sort**  6:24 22:4 35:4,22

**Sound**  23:5

**sounds**  20:8 23:7 27:7 28:1 39:13

**speaking**  39:25

**specialties**  20:7



Christie Masone

April 07, 2025
Index: specialty..writing

**specialty**  20:6

**spell**  10:13

**spit**  6:16

**splits**  23:14

**spoke**  12:3

**spoken**  11:2 13:22 14:1

**start**  6:16 16:22 18:4

**started**  31:25

**starting**  14:19

**state**  6:1 8:21 37:7

**stated**  45:11

**statement**  39:15

**Steel**  10:7

**stipulations**  5:3,15

**story**  14:16

**straight**  16:20 18:10 20:15

**strategic**  30:24 31:5 39:6

**strike**  31:12

**studies**  9:22

**stuff**  21:22,25

**subpoena**  11:6,9,13,16 12:4,10,22
  13:2 43:17,23

**substance**  12:14

**successful**  36:5

**summarize**  38:9

**summary**  19:15

**Swan**  8:5,7,15 10:7,15,18 16:3,9
  17:5,8,10,15 18:8,10,18

**switch**  39:22

**sworn**  5:2,21

**synonymous**  21:17

---

**T**

**table**  19:24

**talk**  12:9,14

**talked**  5:6 19:24 43:24

**talking**  6:17 20:18

**tarnish**  36:11

**telling**  12:24

**term**  35:18

**terminate**  18:24

**terminated**  14:9,15,18 18:22 19:10

**terminology**  11:23

**terms**  15:9 21:10 22:14 23:14 30:18,
  22 31:4 37:2 39:3,6,10

**testified**  5:23 40:16 42:10 44:15,24

**testify**  5:21

**testifying**  6:11

**testimony**  6:10 38:25

**Texas**  7:14 8:9

**thing**  6:24 17:24

**things**  6:13 22:19 30:1 38:10

**thought**  40:16

**threw**  5:9

**tick**  28:24

**time**  7:5,10 11:12,20 12:3 14:1 16:2
  23:4,8,24 24:4,24 26:3 27:18,24
  28:20 30:11 32:24 33:19 35:3 36:16
  38:4 41:5 43:19 44:5 45:6

**times**  6:14 7:24

**title**  19:1,4,6

**today**  6:10 7:22 10:23 11:4,7,17
  13:24 32:14 43:16,24

**told**  12:25 13:2 38:10

**Tom**  25:7 28:24 29:20

**town**  36:9

**transaction**  8:2

**transcript**  45:17,20

**Tribune**  37:15

**true**  36:10 38:14,17,19,23 39:4,5,7,
  9,11,12

**trump**  42:20

**truth**  5:22

**type**  15:9 32:14

---

**U**

**Uh-huh**  18:11

**uh-huhs**  6:24

**ultimate**  24:13

**ultimately**  20:4 21:1

**understand**  6:4,8 7:4 11:23 42:8

**understanding**  18:23 19:25 20:2,5
  26:20 44:25

**unequal**  23:17

**unethical**  35:5

**University**  9:16

**unwilling**  38:5

---

**V**

**values**  22:13

**verbal**  6:22,25

**VINCENT**  5:20

**vocal**  31:4

**voluntarily**  32:7

---

**W**

**W-2**  25:11,13

**wait**  6:19

**walk**  26:16

**wanted**  32:3

**website**  36:25

**William**  6:5 43:13

**Wilson**  14:7,25 20:11 23:12 25:6
  27:19

**Woops**  31:17

**worked**  8:3 17:2 36:20

**working**  37:12

**wrench**  5:10

**write**  34:24

**writing**  18:4



Christie Masone

April 07, 2025
Index: wrote..Zoom

**wrote** 34:21 35:1

---

### Y

**year** 9:11,19 17:21,25 31:25 37:19, 22

**years** 17:11,14 41:19 42:12

**York** 9:2

**you-all** 12:9

---

### Z

**ZIP** 7:17

**Zoom** 5:5,14

